JUSTICE COATS delivered the Opinion of the Court.
¶1 The People brought interlocutory appeals, as authorized by section 16-12-102(2), C.R.S. (2017), and C.A.R. 4.1, from orders of the district court suppressing contraband and statements in the related prosecutions of Fields and Reed. The district court found that the initial contact with both defendants in a parked car constituted an investigatory stop for which the police lacked reasonable articulable suspicion, and it suppressed all evidence acquired after the point of initial contact as the fruit of an unlawful stop.
¶2 Because the district court failed to appreciate that the officers' initial contact with the defendants fell short of a stop, and by the point at which the contact progressed to a seizure within the contemplation of the Fourth Amendment, the officers had acquired the requisite reasonable articulable suspicion, and subsequently probable cause, to justify their investigative conduct, or inevitably would have lawfully arrested the defendants and discovered the contraband, both suppression orders are reversed, and the respective cases are remanded for further proceedings consistent with the judgment of this court.
I.
¶3 Following the arrest of Troy Anthony Fields and Dale Robert Reed, and the seizure of firearms, other weapons, and illegal drugs from their truck and persons, they were each charged, either as a special offender or habitual criminal, or both, with possession of a weapon by a previous offender and various felony drug offenses. In separate prosecutions, each defendant filed motions to suppress, as the fruit of an unlawful investigatory stop, all statements and tangible evidence acquired during their encounter with the police. At the conclusion of a suppression hearing in the prosecution of Reed, at which the only evidence presented came from the officer who arrested Reed, the footage from his body camera, and the tape of a 911 call alerting the police to the defendants' presence and activities, the district court denied Reed's motion. At the conclusion of a later suppression hearing in the separate prosecution of Fields, at which the evidence consisted of the testimony of the officer who arrested Fields as well as the testimony of the officer who arrested Reed, the footage from the body cameras of both officers, the 911 call, and several photos of the seized contraband, the district court made findings of fact and conclusions of law and granted Fields's motions. The district court subsequently granted Reed's motion for reconsideration and his motions to suppress, on the same basis as its ruling concerning defendant Fields.
¶4 The findings of the district court and undisputed evidence from the suppression hearings revealed the following. On the night of January 29, 2017, about 7:30 p.m., the Florence Police Department received a 911 call from a woman, who identified herself as a Loaf N Jug employee named Brandy, to the effect that she believed she was observing a drug transaction occurring in her parking lot. She indicated that a girl got out of a white car, which then left the area, and approached a red truck in the parking lot. The girl conversed with someone in the truck and, at the time of the caller's report, was standing outside the truck by the store's *664 propane tank. An officer responded to the 911 call and spoke with two employees of the Loaf N Jug, including Brandy, who told him that the girl subsequently got into the truck, which moved next door and was currently parked in the Carl's Jr. restaurant parking lot, and the officer relayed this information to dispatch.
¶5 A second officer then responded to the dispatch call and upon seeing a truck that matched the description reported, parked his patrol car, without engaging his emergency lights, in another parking place in the Carl's Jr. lot and approached the open driver-side window of the truck. The first officer to arrive at the scene then left the Loaf N Jug and approached the passenger side of the truck and knocked on the window. In response to questions from the driver-side officer, the driver identified himself as Reed, gave his date of birth, and conceded that he had an old outstanding warrant from Florida. In response to questions from the passenger-side officer, the woman, who was sitting in the back seat, explained that she had gotten out of the truck while it was parked at the Loaf N Jug to smoke a cigarette, and the front seat passenger identified himself as Fields, gave his date of birth, and conceded that while not subject to outstanding warrants, he nevertheless was on probation. The passenger-side officer then stepped away to confirm Fields's information and check for outstanding warrants.
¶6 Upon seeing the exposed handle of a handgun in the area under the center console, the officer addressing Reed asked him to step out of the truck and walked him to its rear, directing him to put his hands on the vehicle; notified the other officer, who at that point was behind the truck, that the occupants had a firearm; and returned to remove the gun from the truck, walk it back to his patrol car, and pat Reed down for more weapons. After receiving permission to remove a hard object he felt in Reed's pocket, which turned out to be a wallet, the officer continued to pat Reed down and at some point felt what he identified as a baggie of methamphetamine, removed it from Reed's pocket, and placed him in handcuffs. During the pat-down, Reed responded to a direct question from the officer by admitting that he had a felony conviction and was not permitted to have a firearm. Although the officer's removal of the baggie of methamphetamine from Reed's person did not appear clearly on the footage from his body cam, the officer expressly testified during cross-examination by defense counsel that the defendant admitted to his felony conviction before, rather than after, the discovery of drugs in his pocket, and this testimony was neither challenged by the defense nor discredited by the court.
¶7 Reed was then placed in the patrol car, and shortly thereafter, the arresting officer ran the serial number of the firearm and was advised that it came back as stolen. The officer testified that he would therefore have learned that Reed had felony convictions in any event, because he could not have released the firearm back to him until he had ensured that it was not stolen and that Reed was not a felon, who would be prohibited from legally possessing a firearm.
¶8 Upon learning of the presence of a firearm, the officer confirming Fields's information returned to the passenger-side door and ordered Fields from the truck, demanding to know whether he had any other weapons on his person. When Fields admitted that he had knives, the officer asked where they were located, warned Fields not to reach for them, and removed a pocket knife and a throwing star from the location indicated by Fields. After continued questioning whether he had missed any weapons and whether Fields had another firearm, Fields eventually announced that he was in trouble, again stating that he was on probation and admitting that he did have a gun in his pocket, loaded but without a chambered round. The officer then searched Fields, removed the handgun from his pocket, discovered a plastic container of methamphetamine, and handcuffed him.
¶9 The district court concluded that the police contact with Reed and Fields, from its very inception, was an investigatory stop that was not supported by the requisite reasonable articulable suspicion, and therefore all evidence subsequently discovered was to be suppressed as the fruit of an unlawful stop. The court granted Fields's motions to suppress *665 all tangible evidence and statements, and after granting Reed's motion to reconsider, granted Reed's similar motions to suppress.
¶10 The People brought an interlocutory appeal as authorized by section 16-12-102(2), C.R.S. (2017), and C.A.R. 4.1, in each case.
II.
¶11 Not all contact between law enforcement officers and other citizens implicates federal or state constitutional protections against unreasonable searches and seizures. I.N.S. v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984) ; People v. Paynter, 955 P.2d 68, 71-72 (Colo. 1998). An encounter between the police and a citizen becomes a seizure within the contemplation of the Fourth Amendment only at the point at which a reasonable person in the citizen's position would no longer feel free to leave, Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or to disregard inquiries or directions from the officer, Florida v. Bostick, 501 U.S. 429, 437, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ; see also United States v. Drayton, 536 U.S. 194, 201, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002). Although not a matter of subjective will as is the case with "consent" to search, such a contact-short-of-a-stop has at times been characterized by both this court and the United States Supreme Court as a "consensual encounter." See, e.g., Florida v. Royer, 460 U.S. 491, 506, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) ; People v. Marujo, 192 P.3d 1003, 1006 (Colo. 2008).
¶12 The Supreme Court has identified two distinct levels of seizure of a person sanctioned by the Fourth Amendment, each permitted for a different purpose and distinguished from the other by the extent to which the individual liberty of the detainee is infringed upon. The lower level, or less intrusive of the two, designated an "investigatory stop," is justified upon reasonable articulable suspicion to believe that the detainee is committing, has committed, or is about to commit a crime, and is limited in scope to a brief detention to confirm or dispel that suspicion. See Dunaway v. New York, 442 U.S. 200, 207-13, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (explaining development, requirements, and scope of investigatory stop and distinguishing it from arrest). Where necessary for the protection of the officer, a minimally intrusive frisk, or pat-down, for weapons is also permitted as a component of an investigatory stop. Id. at 209-10, 99 S.Ct. 2248. The higher level, or more intrusive of the two, amounting to an arrest, is justified only upon the acquisition of probable cause to believe a crime has been committed by the detainee. Id. Whether a formal arrest has been announced or not, an infringement on the liberty of a detainee exceeding that permitted as an investigatory stop, in the absence of probable cause to arrest, amounts to an unlawful seizure. See United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985) (distinguishing cases where intrusiveness transformed lawful Terry stop into unlawful de facto arrest). On the other hand, if probable cause for an arrest has been acquired, the detention no longer need be justified as an investigatory stop but is rather justified as an arrest. Sibron v. New York, 392 U.S. 40, 67, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968) ; People v. Casias, 193 Colo. 66, 563 P.2d 926, 935 (1977) ; see also People v. Lagrutta, 775 P.2d 576, 580-82 (Colo. 1989).
¶13 The question whether an encounter between a law enforcement officer and another citizen has become an investigatory stop cannot be resolved by a single factor applicable to every case but must be evaluated in the totality of the circumstances surrounding the encounter, according to an objective standard. People v. Pancoast, 659 P.2d 1348, 1350-51 (Colo. 1982). While the Supreme Court has identified a number of typically pertinent factors, see, e.g., United States v. Mendenhall, 446 U.S. 544, 554-55, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), it has also made clear that its objective, reasonable person standard presupposes in every case a reasonable innocent person, Bostick, 501 U.S. at 438, 111 S.Ct. 2382, and that a seizure does not occur simply because citizens may feel an inherent social pressure to cooperate with the police, People v. Walters, 249 P.3d 805, 809 (Colo. 2011). "Only when the officer, by means of physical force or show of authority, *666 has in some way restrained the liberty of a citizen may [a court] conclude that 'a seizure' has occurred." Pancoast, 659 P.2d at 1350 (alteration in original) (quoting Terry, 392 U.S. at 21 n.18, 88 S.Ct. 1868 ). By the same token, although the question whether a detention has exceeded the scope of an investigatory stop must similarly be evaluated in the totality of the circumstances, we have also identified various factors that will typically be relevant to that determination. See, e.g., People v. Ramos, 13 P.3d 295, 299 (Colo. 2000). With regard to a search of the detainee's person, in particular, when such a search has exceeded a pat-down, or permissible protective frisk for weapons, the encounter has necessarily exceeded the scope of an investigatory stop. Minnesota v. Dickerson, 508 U.S. 366, 377-78, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993).
¶14 The Supreme Court has characterized probable cause to arrest as reasonably trustworthy information sufficient to warrant a man of reasonable caution in the belief that the arrestee has committed an offense. Draper v. United States, 358 U.S. 307, 313, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). It has at times described probable cause itself as a practical, nontechnical conception rather than a rigid, hypertechnical requirement, and has held that the term refers to no more than a "fair probability," rather than implying proof by a more-probable-than-not standard. Illinois v. Gates, 462 U.S. 213, 231, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) ; see People v. Crippen, 223 P.3d 114, 117 (Colo. 2010). By contrast, the Court has characterized the reasonable articulable suspicion required to support an investigatory stop as "some minimal level of objective justification" that is considerably less than proof of wrongdoing by a preponderance of the evidence and is less demanding even than the "fair probability" standard for probable cause. Alabama v. White, 496 U.S. 325, 329-30, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990) ; see People v. Polander, 41 P.3d 698, 703 (Colo. 2001). Moreover, reasonable suspicion is a less demanding standard not only in the sense that it can be established with information that is different in quantity or content from that required for probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause. White, 496 U.S. at 330, 110 S.Ct. 2412.
¶15 Because a warrant is not required for an arrest outside the home, United States v. Watson, 423 U.S. 411, 423, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976), the lawfulness of any encounter between a police officer and another citizen is therefore a function of the extent of official intrusion on the citizen's liberty at any point in time and the corresponding nature and extent of suspicion surrounding the citizen's activities. Unless and until the police intrude on the citizen's liberty to an extent not permitted as a consensual encounter, or contact-short-of-a-stop, without the requisite reasonable articulable suspicion for an investigatory stop, no unlawful stop can have occurred. And unless or until the police intrude on a citizen's liberty to an extent beyond that permitted as a lawful investigatory stop, without the requisite probable cause to arrest, that otherwise lawful investigatory stop has not become unlawful.
¶16 Whether evidence is actually suppressible as the product of an unlawful seizure of a person, however, implicates not only the timing of the acquisition of that evidence relative to the illegality in question but also various considerations specific to the administration of the exclusionary rule, including whether the acquisition is sufficiently attenuated from the illegality itself, whether it is actually attributable to an independent source, and even if not, whether the evidence would inevitably have been discovered quite apart from any illegality. See Utah v. Strieff, ---U.S. ----, 136 S.Ct. 2056, 2061, 195 L.Ed.2d 400 (2016) (addressing the question of causality and the interrelation of these three "exceptions" to the exclusionary rule, and concluding that the discovery of drugs on the suspect's person in that case was sufficiently attenuated from his initial unlawful stop by the intervening discovery of an outstanding arrest warrant prior to the search). With regard to inevitable discovery in particular, even evidence acquired in an unconstitutional manner is not subject to exclusion if it would inevitably have been discovered, as a *667 matter of course, by an independent investigation arising from circumstances other than those disclosed by the unlawful search itself. See Nix v. Williams, 467 U.S. 431, 446-47, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) ; People v. Burola, 848 P.2d 958, 962 (Colo. 1993) ; People v. Briggs, 709 P.2d 911, 923 (Colo. 1985).
III.
¶17 In its orders granting the motions to suppress of each defendant, respectively, the district court not only failed to conclude that upon initial contact by the officers a reasonable person in the defendants' position would not have felt free to leave or decline to cooperate; it apparently failed to even appreciate that a constitutional seizure is not implicated at all unless and until that is the case. In response to the prosecutor's request for clarification whether the court was finding that the officers needed adequate information to approach the defendants in the first place, the court tersely responded in the affirmative, and after brief argument by defense counsel concerning the nature of a consensual encounter, the court simply declined, without further explanation, to clarify or reconsider its ruling. It is clear from the court's written rulings in each case that it merely presumed the defendants were subjected to an investigatory stop from the initial point of contact, and in its written ruling it simply addressed the question whether the information provided by the Loaf N Jug observers and the officers' limited corroboration prior to approaching the truck, standing alone, amounted to reasonable articulable suspicion for a stop.
¶18 Regardless of the merits of its assessment that the police lacked reasonable articulable suspicion at the point of contact, the district court therefore clearly erred by basing its ruling on an erroneous understanding of the law governing contact between the police and other citizens. Because the existing record adequately demonstrates, however, that the motions to suppress should have been denied, remand for reconsideration under the proper legal standards is unnecessary. Whether or not the information provided the police before making contact with the defendants, in and of itself, amounted to reasonable articulable suspicion justifying an investigatory stop, it is apparent from the district court's factual findings and other undisputed portions of the testimony and exhibits that at least by the point in time at which the defendants were actually subjected to a stop, the officers had acquired that reasonable articulable suspicion; and by the time police conduct exceeded the permissible scope of an investigatory stop, the officers had either acquired, or inevitably would have acquired, probable cause justifying arrests of both defendants and searches incident to those arrests.
¶19 Under the appropriate legal standards, neither defendant was stopped within the contemplation of the Fourth Amendment before he was asked to get out of the truck and was patted down for weapons. There was no need for the officers to stop the defendants' truck because it was already parked in a public parking lot. See Walters, 249 P.3d at 809-10. In approaching the vehicle, the officers did not activate their overhead lights or in any way obstruct the truck's drive path or block it from departing. See id. Other than wearing their uniforms, the officers made no show of authority, display of weapons, or demands of any kind. See id. They explained that they had received a call about the defendants' activities and inquired what was going on, sought identifying information, and asked whether each respective defendant had a record of convictions. Any compulsion the defendants may have felt to cooperate by responding to the officers' questions at that point could only have been attributable to the fact that they were clearly law enforcement officers or that the defendants were intent upon diverting suspicion and obscuring their unlawful conduct, neither of which could elevate a contact-short-of-a-stop to a constitutionally cognizable stop.
¶20 The earliest point at which a reasonable person in the position of either defendant could have felt compelled to comply was the point at which Reed was directed to get out of the truck while keeping his hands in sight and was directed to place his hands on the vehicle, to be frisked for weapons. By that point in time, the officer was not *668 only aware of the first-hand observations of a citizen informant that appeared to her to be a drug deal in progress, cf. Polander, 41 P.3d at 703 (report of restaurant employee more than anonymous tip), along with the officers' own verification of her information that the two men and the woman, in the red truck, were then parked, at night time, in the Carl's Jr. lot, but also that the driver had admitted to having an outstanding warrant from Florida and had an exposed firearm within grabbing range in the cab of the truck. Whether or not the officer had probable cause to arrest on the likelihood of an outstanding Florida warrant alone, see People v. Thompson, 793 P.2d 1173, 1176 (Colo. 1990) (citing People v. Gouker, 665 P.2d 113, 115-16 (Colo. 1983) ) (finding an outstanding arrest warrant from another jurisdiction is normally sufficient in itself to provide probable cause for an arrest), his information clearly rose to the minimal level of objective suspicion required for an investigatory stop of Reed and the requisite danger to support a pat-down for additional weapons.
¶21 During the pat-down, the officer inquired, and in response to his direct question, Reed conceded that he had a felony conviction and was not permitted to possess a firearm, giving the officer, at that point if not sooner, probable cause to arrest him. Although not a specific factual finding of the district court, the officer testified, without challenge, in response to a direct question of defense counsel that this admission preceded the discovery of illegal drugs on Reed's person, and therefore this fact is to be treated as a matter of law by a reviewing court. See People v. Rivas, 13 P.3d 315, 320 (Colo. 2000). Whether or not the officer's testimony to the effect that he was able from his experience and sense of touch during the pat-down alone to reasonably believe that the packet he felt contained methamphetamine had to be credited by the fact finder, he had already acquired probable cause to arrest Reed for possession of a firearm by a previous offender and search him incident to that arrest. See § 18-12-108, C.R.S. (2017).
¶22 Similarly, with regard to Fields, prior to any direction to step out of the vehicle, a firearm had been discovered under the center console in the truck's cab, and Fields had admitted to being on probation. As with Reed, in combination with the information provided by the citizen informant and the officers' own other observations, this additional information amounted, at the very least, to reasonable articulable suspicion to investigate further for both the illegal distribution of drugs and possession by a previous offender, and to frisk Fields for the officer's own protection. And before the officer's pat-down of Fields had, with the removal of drugs from his pocket, even arguably exceeded the permissible scope of an investigatory stop, Fields had further conceded that he possessed another firearm and knew that his probationary status prohibited him from doing so. Despite not having yet confirmed the fact that Fields was on probation for conviction of a felony, based on this concession the officer had reason to believe, amounting to probable cause sufficient to arrest, that Fields was a previous offender in possession of a firearm.
¶23 Finally, with regard to both Reed and Fields, even if there could have been some question about the timing of Reed's admission relative to the discovery of illegal drugs or the significance of Fields's admission concerning his probationary status, the timing of the ongoing investigation of the firearm discovered in the cab between the two men made it manifest that neither suspect could have been released without first being arrested and searched incident to that arrest. The prosecution asserted inevitable discovery as an alternate basis for denying the motions to suppress and established through the officer's uncontested testimony at the suppression hearing that he would not have been permitted to return the firearm without first establishing that it was not stolen and that the owner was legally entitled to possess it. It was therefore beyond any reasonable dispute that the officer would, in any event, necessarily have learned that both Reed and Fields were previously convicted felons and that the unattended firearm between them was stolen, before releasing either or returning the firearm to them, and at that point, as a matter of standard operating *669 procedure, they would have been arrested and searched. See Burola, 848 P.2d at 962.
¶24 By being no more intrusive of the suspects' liberty than was necessary and justified by their mounting suspicion of criminal activity at each step in their investigation, the officers avoided unconstitutionally infringing on the rights of private citizens, and by following through with the independent investigation of the firearm they discovered in the truck, as required by their own protocol, they ensured that even an error in timing on their part, had one occurred, would not have resulted in the suppression of evidence of a crime.
IV.
¶25 Because the district court failed to appreciate that the officers' initial contact with the defendants fell short of a stop, and by the point at which the contact progressed to a seizure within the contemplation of the Fourth Amendment, the officers had acquired the requisite reasonable articulable suspicion, and subsequently probable cause, to justify their investigative conduct, or inevitably would have lawfully arrested the defendants and discovered the contraband, both suppression orders are reversed, and the respective cases are remanded for further proceedings consistent with the judgment of this court.