Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
March 11, 2019

**2019 CO 18**

**No. 18SA263, *People v. Threlkel*—Investigatory Stop—Grounds for Stop or Investigation—Fellow-Officer Rule.**

An extensive narcotics investigation culminated in arrest warrants for the defendant and her significant other based on their alleged distribution of controlled substances. While attempting to execute the warrants, deputies observed a truck belonging to the defendant's significant other driving away from the residence shared by the couple. The deputies suspected that the defendant was a passenger in the truck. As the deputies tried to stop the truck, it evaded them. At one point, the deputies observed a white bag fly out of the passenger window, which supported their belief that there was a passenger in the truck. The truck eventually stopped within a mile of the home. Inside, they located the defendant's significant other, but not the defendant. Moments later, however, the defendant was spotted a couple of hundred yards away, attempting to hitch a ride. It was a frigid and snowy night, the roads were slippery, and there was no easy access on foot between the home and the location of the stop. A deputy who recognized the defendant detained her, and she was later arrested on her outstanding warrant.

The trial court suppressed all evidence and observations derived from the defendant's stop, finding that the deputies lacked reasonable, articulable suspicion to detain her.  Later, the trial court explained that its suppression order included the deputies' observations and investigation before they contacted the defendant.

The supreme court reverses.  It concludes that the deputies had reasonable, articulable suspicion to stop the defendant.  It further concludes that the trial court lacked authority to suppress the deputies' observations and investigation before they contacted the defendant.

**The Supreme Court of the State of Colorado**
2 East 14th Avenue • Denver, Colorado 80203

**2019 CO 18**

**Supreme Court Case No. 18SA263**
*Interlocutory Appeal from the District Court*
Arapahoe County District Court Case No. 17CR3478
Honorable Andrew C. Baum, Judge

**Plaintiff-Appellant:**

The People of the State of Colorado,

v.

**Defendant-Appellee:**

Amber Anne Threlkel.

**Order Reversed**
*en banc*
March 11, 2019

**Attorneys for Plaintiff-Appellant:**
George H. Brauchler, District Attorney, Eighteenth Judicial District
Jacob Edson, Chief Deputy District Attorney
　　　*Centennial, Colorado*

**Attorneys for Defendant-Appellee:**
Megan A. Ring, Public Defender
Alaina Almond, Deputy Public Defender
Stephanie Howard, Deputy Public Defender
　　　*Centennial, Colorado*

**JUSTICE SAMOUR** delivered the Opinion of the Court.

¶1 As part of an extensive narcotics investigation that spanned almost all of 2017, law enforcement deputies obtained arrest warrants for the defendant, Amber Anne Threlkel, and her significant other, Robert Allen, based on their alleged distribution of controlled substances. The deputies executed the warrants on December 7, 2017. That evening, they observed a truck owned by Allen leave the residence he shared with Threlkel; they suspected that Allen and Threlkel were both in the truck. As the deputies attempted to perform a traffic stop, the truck evaded them, causing them to momentarily lose sight of it. But they eventually spotted the truck again, stopped it, and apprehended the driver, Allen, within a mile of the home. Although there was no passenger in the truck, Threlkel was located a couple of hundred yards from it, attempting to hitch a ride. It was a frigid and snowy night, the roads were slippery, and there was no easy access on foot between the home and the location of the stop. A deputy who recognized Threlkel detained her. Threlkel was later arrested pursuant to her outstanding warrant.

¶2 Threlkel was charged with multiple drug-related offenses. Before trial, she filed several motions to suppress. The trial court granted one of them, finding that the deputies lacked reasonable, articulable suspicion to stop her. The court thus suppressed all evidence and observations derived from Threlkel's stop, including her statements. It later clarified its ruling at the prosecution's request. It explained that its suppression order included the deputies' observations and investigation *before* they contacted Threlkel. Therefore, observed the court, the prosecution would not be allowed to mention at trial that Threlkel was even at the location where she was detained.

2

¶3     We now reverse.  We conclude that the deputies had reasonable, articulable suspicion to detain Threlkel.  We further conclude that, even if the trial court's contrary ruling had been correct, there is no authority to suppress the deputies' observations and investigation before they contacted Threlkel.  Accordingly, we remand this matter to the trial court for further proceedings consistent with this opinion.

## I.  Facts and Procedural History

¶4     In early 2017, deputies from the Arapahoe County Sheriff's Office narcotics team launched an extensive drug-related investigation of Threlkel and Allen.  At some point, the deputies obtained arrest warrants for the couple based on their alleged distribution of controlled substances.  At approximately 7 p.m. on December 7, 2017, Deputy Wood and other narcotics deputies were surveilling the home shared by Threlkel and Allen, looking for an opportunity to execute the warrants.  They were hoping to catch Threlkel and Allen away from the home.  Allen's truck was parked in front of the residence.  While the deputies did not see anyone enter the truck, they noticed that it remained outside the home with its headlights on for a long period of time.  This led Deputy Wood to suspect that both Allen and Threlkel were in the truck.

¶5     When the truck drove away from the home, the narcotics team asked Deputy Rivers, a patrol deputy, to conduct a traffic stop and contact the occupants of the truck

3

pursuant to the outstanding arrest warrants.[1]  Although he did not have information about the identity of the truck's occupants, Deputy Rivers was told that the driver was believed to be male and that the passenger was believed to be female.

¶6     As Deputy Rivers arrived at the residential community where the home is located, he started looking for the truck.  It was snowing, there were freezing temperatures, and the roads were icy.  Upon spotting the truck, Deputy Rivers turned around so that he could get behind it.  While he and other deputies were in pursuit, the truck started driving erratically and evading them.  The truck then pulled over, only to take off again.  The deputies temporarily lost sight of it, but located it shortly thereafter.  They subsequently observed the truck crash through a private gate.  They also saw what appeared to be a white bag fly out of the passenger window, which supported their belief that there was a passenger in the truck.  The truck eventually stopped within a mile of the home and Allen was apprehended.  There was no passenger in the truck.

¶7     Moments after Allen was detained, a nearby driver informed Deputy Rivers that she had just seen a white female in a white coat walking southbound, away from the location of the truck, trying to hitch a ride.  Deputy Rivers then saw a white female wearing a white coat on foot within a couple of hundred yards of where the truck had stopped; there was no easy access by foot between the home and that area.  Because Allen

---

[1] Deputy Wood testified that they had other grounds to stop the truck: its unlawfully altered suspension and the lack of a visible front license plate.

was being held in his patrol car, Deputy Rivers decided to contact the female on foot. However, a member of the narcotics team, Deputy Daly, beat him to the punch.

¶8    Deputy Daly did not testify at the hearing. However, Deputy Rivers was aware that Deputy Daly had been involved in this investigation, knew about the arrest warrants, and could recognize Threlkel. More importantly, by the time Deputy Rivers reached the female, Deputy Daly "had already visually identified her" as Threlkel. Deputy Daly temporarily detained Threlkel in order to confirm her arrest warrant. Once the warrant was verified, Threlkel was arrested.

¶9    Threlkel was subsequently charged with multiple drug-related offenses. Before trial, she filed three motions to suppress. The trial court held an evidentiary hearing during which the prosecution presented testimony from Deputy Rivers and Deputy Wood. Threlkel did not present any testimonial evidence.

¶10   The trial court found that both deputies were credible and that their testimony had no reliability issues. Yet, it ruled that the deputies violated Threlkel's rights under the Fourth Amendment because they lacked a reasonable, articulable suspicion to detain her. The trial court seemed troubled by the fact that Deputy Daly did not testify since he was the deputy "who [was] able to identify Ms. Threlkel as being the one the warrant was valid for." Notably, the trial court acknowledged Deputy Rivers's uncontroverted testimony that "Deputy Daly . . . knew that the white female that was pointed out by [the] unknown driver was Ms. Threlkel." But it nevertheless suppressed all evidence and observations derived from Threlkel's stop, including her statements, because it felt that

5

there were important details missing in the testimony provided by Deputies Rivers and Wood.

¶11 At a later status hearing, the trial court clarified its ruling at the prosecution's request. It indicated that its suppression order went beyond the evidence and observations derived from Threlkel's stop—the order also included the deputies' observations and investigation *before* they contacted Threlkel. According to the court, Threlkel was "not arrested at the scene" because "[t]here's no evidence to indicate that she was even there." Therefore, concluded the court, the prosecution would not be allowed to introduce evidence at trial that the deputies contacted Threlkel at all.

¶12 The prosecution then brought this interlocutory appeal.[2]

## II. Analysis

¶13 The prosecution argues that the trial court erred both in ruling that the deputies lacked reasonable, articulable suspicion to detain Threlkel and in suppressing evidence preceding their contact with her. We agree. We conclude that the deputies had reasonable, articulable suspicion to detain Threlkel. We further conclude that, even if the trial court's contrary ruling had been correct, there is no authority to suppress the

---

[2] This interlocutory appeal was properly filed pursuant to section 16-12-102(2), C.R.S. (2018) (requiring the People to certify that the appeal is not taken for purposes of delay and that the evidence is a substantial part of the proof of the charge pending against the defendant), and C.A.R. 4.1(a) (same).

deputies' observations and investigation before they contacted Threlkel. Accordingly, we reverse and remand for additional proceedings consistent with this opinion.[3]

¶14     We first set forth the applicable standard of review, followed by the relevant legal principles. We then address the merits of the prosecution's appeal, discussing in turn the trial court's finding of no reasonable, articulable suspicion and the trial court's suppression of the deputies' observations and investigation preceding their contact with Threlkel.

## A.  Standard of Review

¶15     Our review of a trial court's order addressing a defendant's motion to suppress involves "a mixed question of law and fact." *People v. Gothard*, 185 P.3d 180, 183 (Colo. 2008). We defer to the trial court's factual findings and do not disturb them "if they are supported by competent evidence in the record." *People v. Castaneda*, 249 P.3d 1119, 1122 (Colo. 2011). However, "the trial court's legal conclusions are subject to de novo review." *People v. Pitts*, 13 P.3d 1218, 1222 (Colo. 2000).

## B.  Relevant Legal Principles

¶16     The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures by police. *People v. Cox*, 2018 CO 88, ¶ 7, 429 P.3d 75, 78. But the Fourth Amendment does not prohibit all contact of citizens by law

---

[3] In a per curiam order, we previously denied Threlkel's motion to dismiss this appeal as untimely.

enforcement. *People v. Fields*, 2018 CO 2, ¶ 11, 411 P.3d 661, 665. Rather, it aims "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." *Imm. & Nat. Serv. v. Delgado*, 466 U.S. 210, 215 (1984) (quoting *United States v. Martinez-Fuerte*, 428 U.S. 543, 554 (1976)).

¶17 There are "two distinct levels of seizure of a person" that implicate the Fourth Amendment: an investigatory stop and an arrest. *Fields*, ¶ 12, 411 P.3d at 665. The former is the "less intrusive of the two." *Id.* It is justified when there is "reasonable articulable suspicion to believe that the detainee is committing, has committed, or is about to commit a crime," and its scope is limited "to a brief detention to confirm or dispel that suspicion." *Id.* The latter is the "more intrusive of the two." *Id.* It is justified when there is "probable cause to believe a crime has been committed by the detainee." *Id.* In this case, we are concerned only with the less intrusive type of seizure—an investigatory stop.

¶18 An officer's investigatory stop complies with the Fourth Amendment when three criteria are met: (1) there is "an articulable and specific basis in fact for suspecting (i.e., a reasonable suspicion) that criminal activity has taken place, is in progress, or is about to occur"; (2) the purpose of the intrusion is reasonable; and (3) the intrusion's character and scope are "reasonably related to its purpose." *People v. Reyes-Valenzuela*, 2017 CO 31, ¶ 11, 392 P.3d 520, 522–23 (quoting *People v. Salazar*, 964 P.2d 502, 505 (Colo. 1998)). Because the trial court found that the first prong—reasonable, articulable suspicion—was not satisfied, it did not address the second and third prongs. Hence, only the first prong is at issue in this appeal.

8

¶19    To determine whether an officer had a reasonable, articulable suspicion to conduct an investigatory stop, we consider "whether there were specific and articulable facts known to the officer, which taken together with reasonable inferences from these facts, created a reasonable suspicion of criminal activity to justify the intrusion into the defendant's personal security." *Id.* at ¶ 12, 392 P.3d at 523 (quoting *Salazar*, 964 P.2d at 505). This requires us to consider the totality of the circumstances. *Id.* Rather than focus on the subjective intent of the officer, we objectively analyze whether, under all the circumstances present, a reasonable and articulable suspicion existed. *Id.*

¶20    An officer is entitled to draw reasonable inferences from all the circumstantial evidence "even though such evidence might also support other inferences." *Id.* at ¶ 14, 392 P.3d at 523 (quoting *Castaneda*, 249 P.3d at 1122). It is for this reason that the Supreme Court has cautioned against engaging in a "divide-and-conquer analysis" that results in the dismissal of factors simply because they have plausible innocent explanations. *Id.* (quoting *United States v. Arvizu*, 534 U.S. 266, 274–75 (2002)). Indeed, a reasonable, articulable suspicion may be present "even where innocent explanations are offered for conduct." *Id.* (quoting *Castaneda*, 249 P.3d at 1122). Nor can we discount acts which, in isolation, appear to be innocent. *Id.* at ¶ 13, 392 P.3d at 523. Several such acts "may add up to a reasonable, articulable suspicion of criminal activity." *Id.* As the United States Supreme Court has recognized, "innocent behavior frequently will provide the basis for a showing of probable cause," *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983), which is a more demanding standard than reasonable, articulable suspicion. The relevant inquiry

9

is not whether the defendant's conduct is innocent or guilty, "but the degree of suspicion that attaches to particular types of noncriminal acts." *Reyes-Valenzuela*, ¶ 13, 392 P.3d at 523 (quoting *United States v. Sokolow*, 490 U.S. 1, 10 (1989)).

¶21     When we consider a challenge to an investigatory stop, we are not limited to an officer's observations because an officer is entitled to rely on information supplied by another person, including a fellow officer. *See id.* at ¶ 15, 392 P.3d at 523. An officer who does not personally possess reasonable, articulable suspicion may still lawfully make an investigatory stop under the fellow-officer rule if: "(1) he acts at the direction or as a result of communications with another officer, and (2) the police as a whole possess a sufficient basis to make the [stop]." *People v. Arias*, 159 P.3d 134, 139 (Colo. 2007). "The purpose of the fellow officer rule is to allow law enforcement agencies to work together as a team," instead of requiring that each officer personally and independently "possess the particularized information necessary to make the [stop]." *Id.* When an investigation is expanded so as to include officers not at the scene of an alleged crime, the fellow-officer rule "operates to integrate those outside officers and make them part of the coordinated investigation." *People v. Swietlicki*, 2015 CO 67, ¶ 27, 361 P.3d 411, 416 (quoting *Grassi v. People*, 2014 CO 12, ¶ 14, 320 P.3d 332, 336). Through the rule, "information that the police possess as a whole" is "impute[d] . . . to an individual officer." *Grassi*, ¶ 13, 320 P.3d at 336.

¶22     While the fellow-officer rule "impute[s] information from officers who possess it to those who do not," we have made clear that "it does not require a linear chain of

10

communication from one officer to the next." *Id.* at ¶ 17, 320 P.3d at 337. Instead, "the rule pools the collective knowledge of officers" working together as a cohesive unit in a coordinated investigation. *Id.* Moreover, so long as the police remain engaged in such a coordinated investigation, "the rule encompasses information that the police as a whole possess at the time of the relevant action," —i.e., at the time of the challenged search or seizure. *Id.* at ¶ 18, 320 P.3d at 337.

## C. Application

### 1. The Deputies Had Reasonable, Articulable Suspicion to Stop Threlkel

¶23 The first question we must address is whether the trial court erred in finding that the deputies lacked reasonable, articulable suspicion to stop Threlkel. We conclude that it did.

¶24 The trial court faltered from the outset when it determined that no reasonable, articulable suspicion could be shown without testimony from Deputy Daly, the deputy who stopped Threlkel. As the trial court acknowledged, Deputy Rivers credibly testified that he was aware that Deputy Daly had been involved in this investigation and knew both that Threlkel had an outstanding arrest warrant and that "the white female that was pointed out by [the] unknown driver was Ms. Threlkel." This uncontroverted testimony, alone, established reasonable, articulable suspicion to stop Threlkel.

¶25 But the trial court reasoned that this testimony was not sufficient because it felt that certain important details were missing. For example, it pointed out that it lacked information related to: the fact that there was only one person found in the truck and

11

there were "no footprints that could potentially tie Ms. Threlkel and her location to getting out of the truck"; "how long the truck was stopped or whether it was even possible for someone to get out of the truck" before Allen was detained; whether there was enough time for someone to exit the truck while the deputies lost sight of it during their pursuit; and where the deputies lost sight of the truck during their pursuit and whether there were footprints in that area.

¶26 The trial court misapplied the reasonable, articulable suspicion standard. In effect, the trial court required the deputies to rule out the potential innocent alternative: that the female stopped was someone other than Threlkel who just happened to be walking and asking for a ride, in a residential community, during a frigid and snowy night, less than a mile away from her home, and just a couple of hundred yards from the location where the truck was stopped and Allen was detained. However, the fact that an innocent explanation may be imagined does not defeat the deputies' reasonable, articulable suspicion. *See Reyes-Valenzuela*, ¶ 14, 392 P.3d at 523. Instead, the deputies were entitled to draw reasonable inferences from all the circumstantial evidence even if the evidence might also support other inferences. *See id.* The proper inquiry was whether, considering all the circumstances together, the deputies had an objectively reasonable basis to believe that the female they stopped was Threlkel.

¶27 Here, it is clear that, even without the missing details identified by the trial court, the deputies had a reasonable, articulable suspicion to believe that the female they stopped was Threlkel:

- Threlkel and Allen were the subjects of a nearly year-long narcotics investigation that culminated in their arrest warrants.

- The truck had earlier been parked outside the home for some time with its headlights on.

- As the truck evaded them, the deputies observed what appeared to be a white bag thrown out of the front passenger window, which supported their belief that there was a passenger inside.

- When the deputies finally stopped the truck, they confirmed that Allen was the driver.

- Although there was no passenger in the truck, the deputies were aware that they had temporarily lost sight of it during their pursuit.

- Shortly after detaining Allen, the deputies saw a white female within a couple of hundred yards from the truck.

- Both she and the truck were within a mile of the home.

- There was no easy access by foot from the home to the area where the deputies spotted her.

- She was on foot, moving away from the truck, and attempting to hitch a ride.

- And this was a residential community; it was a frigid and snowy night; and the roads were slippery.

In short, there were specific and articulable facts known to the deputies, which considered together and in conjunction with the fair inferences drawn from those facts, created a reasonable suspicion that the female spotted shortly after Allen's detention was Threlkel.

¶28 The trial court seemed to give short shrift to these facts and inferences because Deputy Rivers did not know what Threlkel looked like and the record does not reflect when he was notified that the female contacted was identified as Threlkel. But Deputy

Rivers did not stop Threlkel—Deputy Daly did. And, as we mentioned, the evidence at the hearing indisputably established, and the trial court acknowledged, that Deputy Daly was involved in this investigation and knew what Threlkel looked like and that she was wanted on an arrest warrant.

¶29 In any event, to the extent the trial court focused on Deputy Rivers's personal knowledge, it erred in finding that it was insufficient to justify Threlkel's stop. The knowledge personally possessed by Deputy Rivers, though limited, was sufficient to form a reasonable, articulable suspicion that the female located just a couple of hundred yards from the truck had exited the truck during or after the deputies' pursuit and was the person the narcotics team was attempting to arrest. Under all the circumstances, that was a reasonable inference, if not the most reasonable inference, for Deputy Rivers to draw.

¶30 There is an additional, independent ground to support our determination that Deputy Rivers had a reasonable, articulable suspicion to stop Threlkel: the fellow-officer rule. The trial court applied this rule, but did so incorrectly. We conclude that the rule imputed the collective knowledge of all the narcotics deputies to Deputy Rivers because both of its requirements were met. *See Swietlicki*, ¶ 27, 361 P.3d at 416. First, Deputy Rivers acted at the direction of or as a result of communications with other deputies. *Id.* Specifically, the narcotics deputies asked Deputy Rivers to conduct a traffic stop of the truck and communicated to him that they believed there were two occupants in the truck, a male driver and a female passenger, and that both had outstanding warrants for their

14

arrest. Second, at the time of the challenged seizure, the narcotics team, as a whole, possessed a reasonable, articulable suspicion to stop Threlkel and to believe that the female spotted shortly after Allen's detention was, in fact, Threlkel. *Id.*

### 2. No Authority Exists to Suppress Evidence Gathered Prior to Threlkel's Stop

¶31 Having concluded that the trial court erred in finding there was no reasonable, articulable suspicion to stop Threlkel, the remaining question is whether it had authority to suppress evidence obtained before Threlkel was contacted. We conclude that it did not.

¶32 A few weeks after excluding all evidence and observations derivative of Threlkel's stop, the trial court compounded the error by extending its suppression order to any observations and investigation *preceding* Threlkel's stop. The trial court did not cite any authority in support of this ruling, and our research has unearthed none.

¶33 The United States Supreme Court adopted the exclusionary rule to give effect to the Fourth Amendment's guarantee against unreasonable searches and seizures. *Casillas v. People*, 2018 CO 78M, ¶ 19, 427 P.3d 804, 809–10. But the exclusionary rule is limited in scope: It prohibits "the use of improperly obtained evidence at trial, as well as evidence later discovered and found to be *derivative of an illegality*." *Id.* (emphasis added) (internal citations omitted). It has never been applied to suppress evidence obtained *before* an illegality occurred. Such application would be inconsistent with the rule's purpose "to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring v. United States*, 555 U.S 135, 144 (2009).

15

Hence, in addition to incorrectly finding that the deputies lacked reasonable, articulable suspicion to stop Threlkel, the trial court mistakenly suppressed evidence obtained before Threlkel was contacted.

## III. Conclusion

¶34 We conclude that the trial court erred in finding that the deputies lacked reasonable, articulable suspicion to stop Threlkel. We further conclude that the trial court aggravated that error by extending its suppression order to include any observations and investigation preceding the stop. Accordingly, we reverse the trial court's suppression order and remand the matter for further proceedings consistent with this opinion.