2022 CO 19 The People of the State of Colorado, Plaintiff-Appellant: v. Marcelino Andrade Moreno. Defendant-Appellee: No. 21SA330
Supreme Court of Colorado, En Banc
April 25, 2022

 Interlocutory Appeal from the District Court Larimer County
 District Court Case No. 21CR746 Honorable Stephen J. Jouard,
 Judge

 Gordon
 P. McLaughlin, District Attorney, Eighth Judicial District of
 Colorado Michael W. Deschenes, Deputy District Attorney
Austin Johnston, Deputy District Attorney Fort Collins,
 Colorado Attorneys for Plaintiff-Appellan

 The
 Law Office of Charles W. Elliott Charles W. Elliott Denver,
 Colorado Attorneys for Defendant-Appellee

 JUSTICE MÁRQUEZ, JUSTICE HOOD, JUSTICE GABRIEL,
 JUSTICE HART, JUSTICE SAMOUR, and JUSTICE BERKENKOTTER
 joined.

 BOATRIGHT CHIEF JUSTICE

 OPINION

 ¶1
 In this interlocutory appeal of a suppression order, we
 consider whether the trial court erred when it found that the
 police lacked reasonable articulable suspicion to support an
 investigatory stop. We hold that, under the totality of the
 circumstances, the officers had reasonable suspicion to
 conduct the stop. We therefore reverse the trial court's
 order suppressing evidence obtained from the search and
 remand for further proceedings consistent with this opinion.

 I.
Facts and Procedural History

 ¶2
 In January 2021, the Northern Colorado Drug Task Force
 ("NCDTF") received an anonymous tip that claimed
 two residents of a home in Berthoud were dealing a variety of
 drugs, including methamphetamine. The tip provided specific
 information: (1) the address of the house, and that it was
 the "corner house behind habitat for humanity"; (2)
 a physical description of the residents, along with their
 names and phone numbers, and information that they were a
 husband and a wife who "sell fentanyl out of their
 home"; (3) that the couple's vehicle was a white GMC
 Acadia SUV; and (4) that the couple sold "mainly
 fentanyl pills" as well as "Oxy blue 30s [and]
 meth" that were "[k]ept in his bedroom . . . in the
 nightstand across from the bed" and were sold "all
 different ways" but mainly "from his mailbox."

 ¶3
 NCDTF did not act on this information for three months. At
 that point, NCDTF placed the home under surveillance and
 confirmed that the people named in the tip still resided at
 the listed address. The surveilling officer saw a woman, who
 matched the physical description of the wife in the tip,
 doing yard work. She went in and out of a small garden shed
 on the property where she brought out typical gardening
 tools. Soon, a man who matched the tip's description of
 the husband, arrived at the home in a white GMC Acadia SUV,
 the same make and model of the vehicle described in the tip,
 and went inside the home.

 ¶4
 Several hours into the surveillance, the officer observed an
 unknown man, later identified as Marcelino Moreno, arrive at
 the house in a pickup truck driven by a woman. Moreno exited
 the car, hugged the husband, and followed him into the shed
 where the wife had obtained gardening tools. When the two
 emerged, neither of them carried any tools that might be
 found in a shed. The officer observed that both men seemed to
 be "very conscious of their surroundings, looking over
 their shoulders, [and] looking up and down the street"
 as they returned from the shed. Further, the officer noted
 that as Moreno climbed back into the passenger seat of his
 truck and drove away, he frequently checked his mirrors and
 looked over his shoulder.

 ¶5
 After Moreno left the house, a second officer followed his
 truck in a marked patrol car, while the first officer
 continued to surveil the house. The second officer

 observed that Moreno was uncommonly fixated on his patrol
 car, later testifying that "Moreno's actions far
 exceeded anything [he had] ever seen of an individual
 watching [his] car." About twelve minutes into the
 drive, Moreno's truck stopped at a truck stop and parked
 at a gas pump. The patrol car followed Moreno into the truck
 stop parking lot and parked in a far corner where the officer
 could observe Moreno from a distance. Moreno and the woman
 went into the truck stop, returned to sit in the vehicle for
 a short time, and then drove to another part of the parking
 area. At no point did they pump gas.

 ¶6
 Next, the officer observed Moreno park next to an air
 compressor station. Moreno exited the car and grabbed the
 hose to the air compressor. But Moreno did not actually use
 the air compressor on any of the tires, nor did he bring the
 hose to the tires. Rather, Moreno held the hose and circled
 the vehicle for about five minutes, continually looking up
 and away from his vehicle, all the while still paying special
 attention to the patrol car.

 ¶7
 A short while later, the first surveilling officer, still
 back at the residence, witnessed the husband and wife leave
 the house in their SUV. The officer followed the couple to
 the truck stop where Moreno was waiting. The couple pulled in
 next to Moreno, who exited his own truck carrying a black
 backpack and got into the backseat of the couple's SUV,
 and the three drove off together. The second officer in the
 patrol car then stopped the SUV on suspicion of drug
 trafficking activity.

 Together,
 the officers called a K9 officer, whose dog alerted to the
 presence of narcotics. Subsequently, the officers searched
 the backpack that Moreno had brought with him into the SUV
 and found approximately 460 grams of suspected
 methamphetamine and 13.3 grams of suspected fentanyl. After
 the search, one officer returned to the truck stop to see if
 Moreno's truck remained in the parking lot, but the truck
 and the woman were both gone.

 ¶8
The People charged Moreno with possession of controlled
 substances with intent to distribute. Before trial, Moreno
 moved to suppress the evidence seized from his backpack,
 contending that the officers lacked reasonable suspicion that
 he was involved in any criminal activity at the time of the
 traffic stop.

 ¶
 9 The trial court granted the motion. The court found that,
 because three months had passed from the time of the
 anonymous tip to the time of the officers' surveillance,
 the information contained in the tip was "stale"
 and there were "no intervening observations to
 corroborate suspected criminal activity." The court
 further found that, although the officers' observations
 "may have provided [them] with an intuition or hunch of
 criminal activity," they did not rise to the level of
 reasonable suspicion. Accordingly, the court suppressed all
 evidence obtained from the search of Moreno's backpack.

 ¶
 10 The People then filed this interlocutory appeal.

 II.
Jurisdiction and Standard of Review

 ¶
 11 Pursuant to C.A.R. 4.1 and section 16-12-102(2), C.R.S.
(2021), the People may bring an interlocutory appeal under
 these circumstances. The People certified that they are not
 appealing for purpose of delay and that the suppressed
 evidence is a substantial part of the proof of the charges
 pending against Moreno. 112 "A trial court's
 suppression order presents a mixed question of law and
 fact." People v. McIntyre, 2014 CO 39, ¶
 13, 325 P.3d 583, 586. We defer to the trial court's
 findings of historical fact if they are supported by
 competent evidence. Id. at ¶ 13, 325 P.3d at
 587. However, we review the legal effects of those facts de
 novo. Id.

 III.
Analysis

 ¶13
We first discuss the relevant legal principles governing
 reasonable suspicion. We then apply those principles to the
 facts of this case and conclude that, under the totality of
 the circumstances, the officers had a reasonable suspicion to
 conduct the traffic stop. We therefore reverse the trial
 court's order suppressing evidence obtained from the
 search and remand for proceedings consistent with this
 opinion.

 A.
Reasonable Suspicion Standard

 ¶14
 The United States Constitution and the Colorado Constitution
 both protect individuals from unreasonable searches and
 seizures. U.S. Const. amend. IV;

Colo. Const. art. II, § 7. Nevertheless, a police
 officer may conduct a brief investigatory stop without
 violating an individual's constitutional rights, so long
 as the officer can articulate "a reasonable suspicion of
 criminal activity." People v. Brown, 2019 CO
 63, ¶ 10, 461 P.3d 1, 3 (quoting People v.
 Ingram, 984 P.2d 597, 603 (Colo. 1999)); see also
Terry v. Ohio, 392 U.S. 1, 27, 30-31 (1968).

 ¶15
 The reasonable suspicion standard requires
 "'obviously less' [proof] than is necessary for
 probable cause." Navarette v. California, 572
 U.S. 393, 397 (2014) (quoting United States v.
 Sokolow, 490 U.S. 1, 7 (1989)). However, a police
 officer's notion of criminal activity must be more than a
 "mere generalized suspicion or hunch." People
 v. Wheeler, 2020 CO 65, ¶ 13, 465 P.3d 47, 52.
Instead, the officer must have "a specific and
 articulable basis in fact for suspecting that criminal
 activity has occurred, is taking place, or is about to take
 place." Brown, ¶ 10, 461 P.3d at 3
(quoting People v. Perez, 690 P.2d 853, 855 (Colo.
1984)); see also Terry, 392 U.S. at 21-22
(explaining that inarticulate hunches violate constitutional
 rights). When determining whether a police officer
 articulated a reasonable suspicion, courts look for specific
 facts "'known to the officer,' which 'taken
 together with rational inferences from those facts,' gave
 rise to 'a reasonable and articulable suspicion of
 criminal activity' justifying the intrusion into the
 defendant's personal privacy." Wheeler,
¶ 13, 465 P.3d at 52 (quoting People v.
 Funez-Paiagua, 2012 CO 37, ¶ 9, 276 P.3d 576,
 578-79).

 ¶16
 This standard requires trial courts to consider the totality
 of the circumstances surrounding the investigatory stop.
Id. When considering the totality of the
 circumstances, officers must articulate specific facts that
 support their belief of criminal activity and thus reasonably
 warrant an investigatory stop. Brown, ¶¶
 10-11, 461 P.3d at 3.

 ¶17
 In their consideration, courts must keep "in mind that
 '[a]n officer is entitled to draw reasonable inferences
 from all the circumstantial evidence, '" even where
 such evidence may support other interpretations. Id.
 at ¶ 11, 461 P.3d at 3 (alteration in original) (quoting
People v. Threlkel, 2019 CO 18, ¶ 20, 438 P.3d
 722, 727). While no one factor is dispositive, we have
 previously provided some criteria relevant to this
 determination, including (1) the officer's observations
 of the "activity by the particular person stopped"
 and (2) the officer's "knowledge or suspicion that
 the person or vehicle stopped has been involved in some
 criminality of the type presently under investigation."
Id. (quoting People v. Bell, 698 P.2d 269,
 272 (Colo. 1985)).

 ¶18
 With these standards in mind, we now turn to the facts of
 this case.

 B.
Application

 ¶19
 Moreno argues (and the trial court found) that because the
 anonymous tip was provided more than three months prior to
 the surveillance or any other intervening action, the
 information was stale. But while the possible staleness of

 the tip is problematic and "is certainly a factor, it is
 not dispositive; instead, the totality of the circumstances
 must be considered." Id. at ¶ 13, 461 P.3d
 at 3.

 ¶20
 In this case, the officers testified that the anonymous tip
 was heavily detailed: In addition to stating that there was a
 large amount of in-and-out traffic, the informant provided
 the names and descriptions of the residents, as well as what
 types of drugs were being sold, where they were stored, and
 how they were sold. Although the information was three months
 old, the officers confirmed several facts from the tip such
 as the location of the house, the description of the
 residents, and the description of their car.

 ¶21
 Further, the officers witnessed Moreno acting in a strange,
 hypervigilant manner throughout the time they surveilled him.
Moreno greeted the husband and followed him into a small
 shed, emerging empty-handed and being hypervigilant to his
 surroundings. Moreno paid extraordinary attention to the
 patrol car, both when he drove away from the residence and
 when he arrived at the truck stop. Moreno continued to act
 strangely at the truck stop-first pulling up next to a gas
 pump without filling his gas tank, then moving to the air
 compressor and wandering around with the hose for several
 minutes but never filling his tires. And finally, Moreno
 reunited with the residents at the gas station, less than an
 hour after their initial interaction, and immediately got
 into their SUV while carrying a black backpack.

 ¶22
We conclude that "from all the circumstantial
 evidence" outlined above, the officers "dr[e]w
 reasonable inferences." See id. at ¶ 11,
 461 P.3d at 3 (quoting Threlkel, ¶ 20, 438 P.3d
 at 727). The details provided in the anonymous tip allowed
 them to identify the individuals described in the tip and
 then watch them interact with Moreno both at the house and
 when they reunited at the gas station. The officers observed
 nothing that produced a legitimate explanation for
 Moreno's strange behavior at the truck stop, and none
 appears to have existed. In our view, the officers reasonably
 inferred that Moreno was merely trying to look like he was
 engaging in normal activities (pumping gas and filling his
 tires) before leaving his truck and joining the residents
 from the house in their car.[1]

 ¶23
 Accordingly, after considering the totality of the
 circumstances - including the detailed and corroborated tip,
 Moreno's strange behavior, his hypervigilance,

 and his interaction with the residents-we conclude that the
 officers had reasonable suspicion. To be sure, any one of
 these facts by itself would be insufficient to give rise to
 reasonable suspicion. But taken together, the facts and the
 rational inferences that could be drawn from them established
 reasonable suspicion to believe that Moreno was carrying
 illegal drugs. Under the totality of the circumstances, even
 though the evidence may support other interpretations of the
 facts, the officers' explanation of the situation
 provided an articulable reasonable suspicion of criminal
 activity.

 IV.
Conclusion

 ¶24
We hold that, under the totality of the circumstances, the
 officers had reasonable suspicion to conduct the
 investigatory stop. We therefore reverse the trial
 court's order suppressing evidence obtained from the
 search and remand for further proceedings consistent with
 this opinion.

---------

[1] We note that this case is
 distinguishable from People v. Revoal, 2012 CO 8,
 ¶¶ 12, 15-19, 269 P.3d 1238, 1241, in which we held
 that an officer's observations of the defendant's
 strange behavior-including standing next to a closed
 restaurant in a high-crime area and wandering aimlessly
 across a parking lot while continually looking left and
 right-were insufficient to rise to the level of reasonable
 suspicion. Here, Moreno's suspicious conduct was
 deliberate and supported by the corroborated evidence from a
 detailed anonymous tip alleging criminal activity. See
id. at ¶ 15, 269 P.3d at 1241 ("[B]oth cases
 where the court found reasonable suspicion involved more
 deliberate, suspicious conduct supported by corroborating
 evidence.").

---------