The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
January 10, 2019

**2019COA2**

**No. 17CA0772, *People v. Fuerst* — Regulation of Vehicles and
Traffic — Alcohol and Drug Offenses — Expressed Consent for
the Taking of Blood, Breath, Urine, or Saliva**

In this criminal case, a division of the court of appeals is
asked to decide whether a police officer is authorized to request that
a suspect take a drug test under section 42-4-1301.1(2)(b)(I), C.R.S.
2018, of the Expressed Consent Statute if the officer has already
requested, and the suspect has completed, an alcohol test under
subsection 1301.1(2)(a)(I).  The division answers this question
affirmatively.

COLORADO COURT OF APPEALS     **2019COA2**

Court of Appeals No. 17CA0772
Mesa County District Court No. 16CR706
Honorable Brian J. Flynn, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Kim Maurice Fuerst,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE HAWTHORNE
Tow and Márquez*, JJ., concur

Announced January 10, 2019

Philip J. Weiser, Attorney General, Marixa Frias, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Emilyn Winkelmeyer, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2018.

¶ 1    Defendant, Kim Maurice Fuerst, appeals his conviction for driving while ability impaired (DWAI).  We affirm.

## I.  Background

¶ 2    Defendant backed his car into a pickup truck.  When a police officer arrived on the scene, a bystander told the officer that, after the accident, defendant had asked her if she wanted his beer because he needed to hide it.

¶ 3    Defendant agreed to perform several roadside sobriety tests.  The horizontal gaze nystagmus test indicated that he was under the influence of a central nervous system depressant (CNS depressant).  Alcohol is a CNS depressant.  Defendant also performed poorly on the walk-and-turn and one-leg stand tests and had difficulty following the officer's instructions.  Based on defendant's performance on these tests and his previous statement to the bystander about the beer, the officer believed defendant was under the influence of alcohol.

¶ 4    The officer arrested defendant and gave him the option of taking either a breath or blood test under section 42-4-1301.1(2)(a)(I), C.R.S. 2018, a provision in Colorado's Expressed Consent Statute.  Defendant chose a breath test.  The

breath test results showed that defendant's blood alcohol content was zero.

¶ 5    The officer then concluded that "it had to be drugs" and asked defendant to take a blood test under section 42-4-1301.1(2)(b)(I). Defendant initially refused and asked to speak to the officer's supervisor.  The supervising officer told defendant that if he didn't take the blood test, his driver's license would be revoked. Defendant then agreed to take the blood test.

¶ 6    The blood test revealed 101 nanograms of Alprazolam (Xanax) per milliliter, which is near the upper limit of the therapeutic range for that drug (25 to 102 nanograms per milliliter).  Alprazolam is also a CNS depressant.

¶ 7    Before trial, defendant moved to suppress the blood test results.  After hearing evidence and argument, the trial court denied the motion.

¶ 8    At trial, the jury found defendant not guilty of driving under the influence (DUI) but found him guilty of DWAI and unsafe backing.

## II. The Trial Court Didn't Err in Denying the Motion to Suppress the Blood Test Results

¶ 9      Defendant contends that the trial court erred in denying his motion because the officer's requiring him to complete the blood test — after he had already selected and completed the breath test — wasn't authorized by the Expressed Consent Statute and violated his constitutional rights. We disagree.

### A. Defendant Preserved His Argument

¶ 10      In defendant's written motion to suppress, he argued only that the officer didn't have probable cause to request that he take the blood test. But, at the evidentiary hearing on the motion, during closing argument, the trial court specifically asked the prosecutor, "[T]ell me your position on the law if someone agrees to take a breath test and then can law enforcement ask them for a second test . . . ?" The prosecutor answered that he wasn't aware of anything in the law that would prohibit the second test. Then, during his closing, defendant argued, among other things, that the officer couldn't invoke the Expressed Consent Statute a second time after he had already selected and completed the breath test.

¶ 11    Under these circumstances, we conclude that defendant preserved his contention for appeal.

## B.  Standard of Review

¶ 12    Review of a trial court's suppression order presents a mixed factual and legal question.  *People v. Hyde*, 2017 CO 24, ¶ 9.  We defer to the trial court's factual findings that have record support, but we assess those facts' legal effect de novo.  *Id.*  And we also review de novo the court's interpretation of the Expressed Consent Statute.  *See Fitzgerald v. People*, 2017 CO 26, ¶ 8.

## C.  Analysis

¶ 13    Defendant argues that the Expressed Consent Statute doesn't authorize an officer to request a drug test under subsection 1301.1(2)(b)(I) if the officer has already requested, and the suspect has completed, an alcohol test under subsection 1301.1(2)(a)(I).  We disagree.

¶ 14    Subsection 1301.1(2)(a)(I) authorizes a breath or blood test if an officer has probable cause to believe a driver is under the influence of alcohol.  Subsection 1301.1(2)(b)(I) authorizes a blood, saliva, or urine sample if an officer has probable cause to believe a driver is under the influence of drugs and requiring the test is

reasonable. The statute doesn't say an officer can only do one or the other. In fact, nothing in the statutory language ties together subsections 1301.1(2)(a)(I) and (2)(b)(I), other than that the two provisions are in the same statute. And we disagree with defendant's argument that because there's no express statutory provision allowing an officer to do both, an officer can't do both. We conclude that if the General Assembly had intended to prohibit what the officer did in this case, it would have included language in the Expressed Consent Statute specifying that an officer can proceed under subsection 1301.1(2)(a)(I) *or* (2)(b)(I), *but not both.* To adopt defendant's interpretation would require us to add words to the statute, and "[w]e do not add words to the statute or subtract words from it." *People v. Diaz*, 2015 CO 28, ¶ 12 (quoting *Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007)).

¶ 15    This case's facts are strikingly similar to those in *Halter v. Department of Revenue*, 857 P.2d 535 (Colo. App. 1993). There, the officer had probable cause to believe the plaintiff was impaired by alcohol because of, among other things, his poor performance on roadside sobriety tests. *Id.* at 536, 538. The officer gave the plaintiff the option of performing a breath or blood test under

subsection 1301.1(2)(a)(I), and the plaintiff chose a breath test. *Id.* at 536. The breath test was negative for the presence of alcohol. *Id.* The arresting officer ultimately testified that "because the alcohol came back zero" and he still felt that the plaintiff "was impaired," he thought at that point that the plaintiff "was under drugs" because "that could be the only other answer." *Id.* Another officer then requested that the plaintiff provide a urine sample to test for drugs. *Id.* Over the next several hours, the plaintiff didn't provide a urine sample and his driver's license was revoked. *Id.* at 536-37.

¶ 16    Although the plaintiff in *Halter* didn't make the same statutory argument that defendant does in this case, the *Halter* division analyzed the Expressed Consent Statute and concluded that if an officer has probable cause to believe that a driver is under the influence of alcohol or drugs, the officer may request, and the driver is obligated to complete, "either the applicable alcohol tests or the applicable drug tests *or both*." *Id.* at 538 (emphasis added). Notably, in this case, the People relied on *Halter* in their answer brief but defendant didn't address the case in his reply brief.

¶ 17    Instead, defendant argues that under *Turbyne,* 151 P.3d 563, and section 42-4-1301.1(2)(a.5)(I), the officer couldn't "change" the type of test that defendant had originally requested. We conclude that *Turbyne* and section 42-4-1301.1(2)(a.5)(I) don't apply here.

¶ 18    In *Turbyne,* the officer requested that the defendant submit to a breath or blood test under subsection 1301.1(2)(a)(I), and the defendant chose a blood test. *Turbyne,* 151 P.3d at 565. But, because the officer faced difficulty in getting the blood test completed, he required the defendant to submit to a breath test. *Id.* at 565-66. Under the version of the Expressed Consent Statute in effect at that time, the supreme court held that the officer couldn't change the type of test that defendant had selected under subsection 1301.1(2)(a)(I). *See id.* at 567-72. Soon after the *Turbyne* decision, the General Assembly amended the Expressed Consent Statute by adding section 42-4-1301.1(2)(a.5)(I), providing that an officer isn't bound by the driver's choice between a breath or blood test under subsection 1301.1(2)(a)(I) if "extraordinary circumstances" prevent completing the selected test. *See People v. Null,* 233 P.3d 670, 678 (Colo. 2010) (discussing the statutory amendment).

7

¶ 19   Unlike in *Turbyne*, where the defendant wasn't allowed to take the type of test he had selected under subsection 1301.1(2)(a)(I), defendant chose a breath test and the officer complied by giving him that test. After completing that procedure, the officer had probable cause to believe defendant was under the influence of drugs, and subsection 1301.1(2)(b)(I) authorized the officer to request a blood test.

¶ 20   Defendant doesn't present any independent argument that conducting the blood test violated his constitutional rights. Instead, he argues, "[T]he issue here is whether that procedure [employed by the officer] was lawful under the statute. Because it was not, the blood draw was unconstitutional and the results should have been suppressed." We conclude that the procedure employed by the officer didn't violate the Expressed Consent Statute. Because defendant's statutory claim fails, his constitutional claim necessarily fails.

*III.  The Trial Court Properly Admitted the Blood Test Results at Trial*

¶ 21   Defendant also contends that the trial court violated his confrontation rights and section 16-3-309(5), C.R.S. 2018, by admitting a laboratory report containing his blood test results. He

argues that the witness who testified about the laboratory report and the blood test results wasn't sufficiently involved in the process of testing the blood sample and certifying the results. Again, we disagree.

### A. Further Background

¶ 22 The court admitted the laboratory report based on the testimony of a forensic toxicologist for the Colorado Bureau of Investigation (CBI toxicologist), who was qualified as an expert in forensic science and forensic toxicology.

¶ 23 During initial questioning, the CBI toxicologist testified that he believed he had done at least some of the original testing on defendant's blood sample, but he couldn't confirm that. The prosecutor then offered the laboratory report, but the trial court concluded that the prosecutor hadn't laid a sufficient foundation.

¶ 24 Through further questioning, the CBI toxicologist said that he had created and signed the laboratory report, and explained the process for doing so:

> [W]hen I will begin to write a report, [the] person whose name goes on the report will take in all of the information. They will review it themselves.

9

> They'll go through each of the raw data. They'll make sure that all quality control passes CBI's acceptable criteria.
>
> I will look at the raw data for the case, itself. Make sure that that matches with what's in our electronic database.
>
> I will go through this entire process, write the report. And when I write the report, it will, then, go through a technical review process, where another forensic scientist will come through and make sure everything I did on the report is correct.
>
> And then, after that technical review process, it will go through an administrative review process, where a CBI Supervisor or Manager will go through and make sure everything is grammatically correct, and that what's on the Request for Laboratory Examination was actually done for the case.

The prosecutor followed up by asking, "Does that mean that you performed the screening, or that you reviewed the screening, in its entirety, for accuracy? Or, or could it be both?" The CBI toxicologist responded, "It actually could be both."

¶ 25 Following argument, the trial court concluded that the prosecutor had laid a sufficient foundation, admitted the laboratory report into evidence, and allowed the CBI toxicologist to testify about the blood test results.

## B. Standard of Review

¶ 26 We review defendant's claims de novo. *See Nicholls v. People*, 2017 CO 71, ¶ 17 ("Confrontation claims are reviewed de novo."); *People v. Hill*, 228 P.3d 171, 173 (Colo. App. 2009) (reviewing de novo whether evidence was admissible under section 16-3-309(5)).

## C. Analysis

### 1. Right to Confrontation

¶ 27 The parties disagree about whether the circumstances in this case are more like those in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011), or those in *Marshall v. People*, 2013 CO 51. We agree with the People that the CBI toxicologist's role in completing and signing the laboratory report is much more similar to the circumstances in *Marshall* than those in *Bullcoming*.

¶ 28 In *Bullcoming*, the Supreme Court held that a witness shouldn't have been allowed to testify about the results in a laboratory report because the witness hadn't signed the report certification and hadn't performed or observed the forensic testing on the blood sample. 564 U.S. at 651-63. Instead, the analyst was familiar only with the laboratory's testing procedures generally. *Id.* at 651. The Court described the analyst's testimony as "surrogate

11

testimony," and held that the defendant had the right to confront the analyst who had actually completed and signed the report certification.  *Id.* at 652.

¶ 29    In *Marshall*, the Colorado Supreme Court held that a witness was properly allowed to testify about the results in a laboratory report.  2013 CO 51, ¶ 1.  The witness, a supervisor at the laboratory, hadn't done any of the original testing on the urine sample.  Still, the court held that the supervisor was qualified to testify about the results in the report because she had (1) supervised the testing process; (2) reviewed all the data generated by the test; (3) found that the data accurately determined that the defendant had methamphetamine present in her urine; and (4) certified the test results.  *Id.* at ¶ 2.  The court explained that those circumstances didn't present the type of "'surrogate' testimony" found to be problematic in *Bullcoming*.  *Id.*; *see also People v. Medrano-Bustamante*, 2013 COA 139, ¶¶ 19-25 (a case similar to *Marshall* in which a division of this court held that the admission of a laboratory report didn't violate the defendant's right to confrontation), *rev'd in part on other grounds sub nom. Reyna-Abarca v. People*, 2017 CO 15.

¶ 30    Although the prosecutor could have elicited more specific details about each step of the CBI toxicologist's review process, the CBI toxicologist specified that he personally reviewed all the information — including the raw data generated by the testing on the blood sample — and proceeded through the CBI's quality control process, which included several levels of review.  He then certified the results of that process by signing the laboratory report. As in *Marshall,* these circumstances didn't present the type of "surrogate testimony" found to be problematic in *Bullcoming.*

¶ 31    Defendant emphasizes that the CBI toxicologist couldn't confirm at trial that he had performed the original testing on defendant's blood sample.  But, in *Marshall,* even though the supervisor hadn't completed the original testing on the urine sample, she was still qualified to testify about the results certified in the report.

¶ 32    We are also not persuaded by defendant's argument that the CBI toxicologist's testimony was phrased in terms of the process he generally employed in completing and signing laboratory reports like the one at issue.  We deem it sufficient that he specified that by

signing the laboratory report, he employed the standard, regimented process in completing the laboratory report.

¶ 33     We also find it immaterial that the CBI toxicologist didn't hold a formal supervisory position at the CBI's laboratory.  The important information is that he led the process of reviewing the test results, employed the CBI's quality control process, and certified the results by signing the laboratory report.

*2.  Section 16-3-309(5)*

¶ 34     Section 16-3-309(5) requires that a criminalistics laboratory report be admitted through the testimony of the employee or technician "who accomplished" the analysis in the report.

¶ 35     In *Marshall,* the supreme court held that the supervisor's process of reviewing the testing and completing and certifying the laboratory report fell within the meaning of "accomplish[ing]" the analysis under section 16-3-309(5).  *See Marshall,* ¶¶ 20-23.  The court again emphasized that the supervisor didn't need to have conducted the original testing.  *Id.* at ¶ 22; *see also Medrano-Bustamante,* ¶¶ 26-28 (holding, in a case similar to *Marshall,* that the admission of a laboratory report didn't violate section 16-3-309(5)).

¶ 36     Again, *Marshall* isn't meaningfully distinguishable.  The CBI

toxicologist led the process of reviewing the test results, employed

the CBI's quality control process, and certified the results by

signing the laboratory report.  That fell within the meaning of

"accomplishing" the report under section 16-3-309(5).

*IV.  Conclusion*

¶ 37     The judgment is affirmed.

JUDGE TOW and JUDGE MÁRQUEZ concur.