The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader.  The summaries may not be cited or relied upon as they are not the official language of the division.  Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
March 5, 2020

**2020COA36**

**No. 17CA0820, *People v. Jiron* — Regulation of Vehicles and Traffic — Alcohol and Drug Offenses — Collateral Attack; Constitutional Law — Fourth Amendment — Searches and Seizures**

A division of the court of appeals applies the time bar for collateral attacks on previous convictions for driving under the influence set forth in section 42-4-1702, C.R.S. 2019, for the first time since felony DUI provisions were added to section 42-4-1301, C.R.S. 2019.  Additionally, the divison considers a novel suppression issue and holds that a responding officer reasonably concluded that a person driving a car out of the driveway of a house where an assault had been reported "a couple of minutes" earlier may have been involved in it.

Court of Appeals No. 17CA0820
Arapahoe County District Court No. 15CR2866
Honorable Phillip L. Douglass, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Dorothy Marie Jiron,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE GROVE
Richman and Freyre, JJ., concur

Announced March 5, 2020

Philip J. Weiser, Attorney General, Grant R. Fevurly, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Jessica A. Pitts, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Dorothy Marie Jiron, appeals her convictions for felony driving under the influence (DUI) and DUI per se.  She contends, among other things, that the trial court erroneously denied her motion to suppress and that she should have been permitted to collaterally attack her 1998 DUI conviction.  We affirm.

## I.    Background

¶ 2    Officer Jacob Davis responded to an assault reported at a nearby house.  As he approached the house a few minutes later, he saw a car pull out of the driveway.  Without observing a traffic infraction, he pulled the vehicle over and contacted Jiron, who was sitting in the driver's seat.

¶ 3    During the encounter, Jiron smelled strongly of alcohol, her speech was slurred, and her eyes were glassy and watery.  She was "uneasy on her feet," admitted to having consumed "a few beers," and performed poorly on voluntary roadside maneuvers.  Concluding that she was "very intoxicated," Officer Davis arrested her for DUI.  Results of a blood test performed after Jiron was taken into custody showed that her blood alcohol content (BAC) was .334.

¶ 4    Jiron's defense at trial was that she "wasn't driving," and instead "went outside to catch a moment alone" to cool off after an

altercation with her landlord (the same altercation that led to the report of assault). A jury found Jiron guilty of DUI and DUI per se. At the sentencing hearing, the trial court found, by a preponderance of the evidence, that Jiron had committed three prior DUI offenses, and imposed felony convictions for the DUI and DUI per se counts.

## II. Analysis

¶ 5 Jiron contends that (1) she was entitled to have a jury determine beyond a reasonable doubt whether she had prior DUI convictions; (2) the evidence of the prior DUI convictions was insufficient; (3) the trial court erred by denying her suppression motion; (4) the trial court erred by admitting evidence concerning her BAC through a certifying scientist; and (5) the trial court erroneously admitted expert testimony in the guise of lay witness testimony. Finding no reversible error, we affirm.

## A. Felony DUI Determination

¶ 6 Jiron first contends that her prior DUI convictions were an element of the offense rather than a sentence enhancer, and therefore had to be proved to the jury beyond a reasonable doubt.[1]

¶ 7 Whether a statutory provision is a sentence enhancer or a substantive element of an offense is a question of law that we review de novo. *Lopez v. People*, 113 P.3d 713, 720 (Colo. 2005). We look to the plain language of the statute to decide whether the prior convictions are an element or a sentence enhancer. *Vega v. People*, 893 P.2d 107, 112 (Colo. 1995). If the legislative intent is clear from the plain language of the statute, our analysis is complete. *People v. Vigil*, 2013 COA 102, ¶ 13.

¶ 8 "A statutory provision is a sentence enhancer when the defendant may be convicted of the underlying offense without any proof of the prior conviction." *People v. Gwinn*, 2018 COA 130, ¶ 44. In contrast, elements of a crime are "the legal components

---

[1] Because her argument is conclusory, *see People v. Wallin*, 167 P.3d 183, 187 (Colo. App. 2007), we do not address Jiron's contention that "[t]he Colorado Constitution should be interpreted as requiring proof beyond a reasonable doubt to a jury of every fact that increases a sentence."

that are necessary to establish criminal liability." *People v. Hopkins*, 2013 COA 74, ¶ 8. "Thus, a fact is a sentence enhancer rather than a substantive element of an offense if (1) a defendant may be convicted of the underlying offense without any proof of the fact and (2) the fact merely increases the defendant's potential punishment." *People v. Quezada-Caro*, 2019 COA 155, ¶ 11. Linking the severity of punishment to the presence or absence of an identified fact does not automatically make that fact an element. *Gwinn*, ¶ 44.

¶ 9 "Generally, any fact, *other than the fact of a prior conviction,* that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt." *Id.* at ¶ 45 (emphasis added).

¶ 10 With respect to what is required to elevate a DUI charge from a misdemeanor to a felony, section 42-4-1301(1)(a), C.R.S. 2019, provides, in relevant part, as follows:

> A person who drives a motor vehicle or vehicle under the influence of alcohol or one or more drugs . . . commits driving under the influence. Driving under the influence is a misdemeanor, but it is a class 4 felony if the violation occurred after three or more prior convictions, arising out of separate and distinct criminal

episodes, for DUI, DUI per se, or DWAI . . . or any combination thereof.

¶ 11 Section 42-4-1301(2)(a) is structured similarly and uses the same language with respect to the elevation of a DUI per se charge from a misdemeanor to a felony. Further, section 42-4-1301(1)(j) states that the prosecution "shall set forth such prior convictions in the indictment or information."

### 1. Sentence Enhancer or Element

¶ 12 Jiron contends that the legislative intent in establishing felony DUI was to create a separate offense, not a sentence enhancer. She argues this interpretation is supported by the structure of the felony DUI statute, the pleading requirement that the People include prior convictions in the indictment or information, and comparisons to various other Colorado statutes.[2]

¶ 13 Divisions of this court have split as to whether prior DUI convictions constitute a sentence enhancer or are an element of

---

[2] Jiron also contends that "[t]o the extent there is any ambiguity in the statute, [she] is entitled to lenity." Because our conclusion rests on the unambiguous language of the statute, we do not reach this argument. *See Candelaria v. People*, 2013 CO 47, ¶ 12 (stating rule that when the statutory language is clear, appellate courts do not resort to other rules of statutory construction).

felony DUI.[3]  *Compare Quezada-Caro*, ¶ 24 (holding prior DUI convictions are a sentence enhancer rather than an element of felony DUI), *and Gwinn*, ¶ 39 (holding prior DUI convictions constitute a sentence enhancer that do not require a jury finding), *with People v. Viburg*, 2020 COA 8M, ¶ 1 (departing from *Quezada-Caro* and *Gwinn* and concluding that prior convictions are an element of felony DUI that must be proved to a jury beyond a reasonable doubt).

¶ 14  We agree with *Quezada-Caro* and *Gwinn*, and hold that under section 42-4-1301(1)(a) and (2)(a), prior convictions are a sentence enhancer that need not be submitted to a jury.

¶ 15  Under the plain language of section 42-4-1301(1)(a) and (2)(a), defendants can be convicted of DUI and DUI per se without proof of their prior convictions.  Section 42-4-1301(1)(a) describes DUI as "driv[ing] a motor vehicle or vehicle" while "under the influence of alcohol or one or more drugs."  And section 42-4-1301(2)(a) describes DUI per se as "driv[ing] a motor vehicle or vehicle when

---

[3] The supreme court has granted certiorari on this issue in *Linnebur v. People*, No. 18SC884, 2019 WL 3934483 (Colo. Aug. 19, 2019) (unpublished order).

6

the person's BAC is 0.08 or more at the time of driving or within two hours after driving." With respect to both offenses, the prior conviction provisions are contained in a separate sentence within the relevant statutory subsection. Reading the statutory language in context, *see Vigil*, ¶ 13, we conclude that section 42-4-1301(1)(a) "defines the crime" and then subsequently "establish[es] the class[] of felony." *Hopkins*, ¶ 14. This point is illustrated by the fact that a defendant may be convicted under section 42-4-1301(1)(a) even if she has no prior convictions for driving under the influence.

¶ 16 Although other statutes place prior conviction sentence enhancers in a separate section or subsection from the elements of the offense — *see, e.g.*, § 18-6-401, C.R.S. 2019 (elements of child abuse and prior conviction sentence enhancer); § 18-6-800.3, C.R.S. 2019 (elements of domestic violence); § 18-6-801(7)(a), C.R.S. 2019 (domestic violence prior conviction sentence enhancer); § 18-7-302, C.R.S. 2019 (elements of indecent exposure and prior conviction sentence enhancer) — "the structure of the statute does not change its plain language." *Quezada-Caro*, ¶ 20. But context does bear on proper statutory interpretation. Thus, in the statute prohibiting possession of a weapon by a previous offender (POWPO),

the legislature defined the offense — including the required fact of a qualifying prior conviction — in a single sentence. *See* § 18-12-108(1), C.R.S. 2019.[4] Because "[t]he prior conviction requirement is included in the definition" of the crime, it "is an element of the POWPO offense." *Quezada-Caro*, ¶ 18 (citing *People v. Dist. Court*, 953 P.2d 184, 189 (Colo. 1998)).

¶ 17 Finally, the mere fact that the prior convictions must be pleaded in the charging document does not prove that they are an element of the offense. To the contrary, although the prosecution "shall set forth such prior convictions in the indictment or information," § 42-4-1301(1)(j), a division of this court has concluded that according to the DUI statute's plain language, "prior DUI convictions constitute sentence enhancers that do not require a jury finding, rather than elements of the crime that do." *Gwinn*, ¶ 39. Because we agree with the reasoning of the division in *Gwinn*, we conclude that under the DUI statute, prior DUI convictions are a

---

[4] The elements of POWPO are that (1) the defendant, (2) in the State of Colorado, at or about the date and place charged, (3) subsequent to being convicted of a qualifying felony, (4) knowingly (5) possessed, used, or carried upon her person any weapon that is subject to the provisions of title 18, article 12. *See* § 18-12-108(1) C.R.S. 2019.

sentence enhancer, and not an element of a DUI offense. *See id.* at ¶¶ 43-53. *But see Viburg,* ¶ 12 ("[T]he General Assembly would not have required the prosecutor to plead the prior offenses *in the indictment or information* unless it had intended prior convictions to be elements of the offense.").

¶ 18 Based on the plain language of the statute, we conclude that prior DUI convictions are a sentence enhancer rather than an element of felony DUI. Thus, the trial court properly applied the preponderance of the evidence standard in determining the existence and validity of the prior convictions.

2. *Apprendi/Blakely* Prior Conviction Exception

¶ 19 Jiron next contends that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Blakely v. Washington*, 542 U.S. 296 (2004), she was entitled to a jury finding as to the existence of her prior convictions. We disagree because our supreme court has held that prior convictions are excepted from *Apprendi, see Misenhelter v. People*, 234 P.3d 657, 660-61 (Colo. 2010), and we are bound by supreme court precedent. Thus, contrary to Jiron's claim, if the sentence enhancer is a prior conviction, the defendant does not

9

have a constitutional right to have a jury decide whether she had such a prior conviction. *See Gwinn*, ¶ 45.

### 3. Equal Protection

¶ 20 Finally, for the first time on appeal, Jiron contends that "the Felony DUI scheme violates equal protection" because it prescribes different penalties for the same conduct. In *Quezada-Caro*, ¶ 32, a division of this court rejected this argument "[b]ecause the statutes proscribe different conduct, for which the legislature may impose different penalties." We agree with this reasoning, and therefore conclude that the DUI statutes do not violate Jiron's right to equal protection.

### B. Sufficiency of the Evidence

¶ 21 Jiron next contends that the prosecution did not present sufficient evidence to prove that she had been convicted of three prior DUI offenses. Specifically, Jiron argues that (1) the trial court erroneously applied the statutory time bar to her collateral attack on one of the convictions and (2) the prosecution did not establish a "connecting link" showing that she was the person convicted in the prior cases. We address and reject each contention in turn.

### 1.    Time Bar

¶ 22    Jiron contends that the trial court erred when it found that her collateral challenge to her 1998 DUI conviction was time barred because (1) a statute may not infringe on the right to challenge prior convictions where the conviction was obtained in violation of the right to counsel; and (2) even if the statutory time bar applies, she established justifiable excuse or excusable neglect.

¶ 23    A defendant charged with felony DUI may attack the constitutional validity of her prior impaired driving convictions.  *See People v. Roybal*, 618 P.2d 1121, 1124 (Colo. 1980).  And an unconstitutionally obtained conviction cannot be used in a later proceeding to support guilt or enhance punishment.  *Id.*

¶ 24    However, a motion collaterally attacking the validity of a judgment entered for a prior DUI must be filed "within six months after the date of entry of the judgment." § 42-4-1702(1), C.R.S. 2019.  Jiron was convicted of a DUI on November 4, 1998. Therefore, unless an exception applied (a question that we review de novo, *see Close v. People*, 180 P.3d 1015, 1019 (Colo. 2008)), the time bar for Jiron to collaterally attack her 1998 DUI conviction expired on May 4, 1999.  She did not do so until March 7, 2017.

11

¶ 25  The overwhelming majority of cases addressing time limitations on collateral attacks do so in the context of section 16-5-402, C.R.S. 2019.[5]  However, because both statutes establish an exception for "justifiable excuse or excusable neglect," and since the time bar pertaining to traffic convictions was enacted after section 16-5-402, cases interpreting section 16-5-402 can fairly be assumed to apply to section 42-4-1702 as well.  *See People v. Trimble*, 839 P.2d 1168, 1171-72 (Colo. 1992) (holding a trial court should consider whether "justifiable excuse or excusable neglect" justified an otherwise untimely collateral attack); *People v. Fleming*, 781 P.2d 1384, 1387 n.5 (Colo. 1989) (holding that the five-year grace period that the supreme court had previously held was implied by section 16-5-402 would also apply to postconviction challenges filed pursuant to section 42-4-1501.5, C.R.S. 1984 (repealed 1994)).

---

[5] Section 16-5-402, C.R.S. 2019, is general in scope and establishes different limitation periods for felonies, for misdemeanors, and for petty offenses.  In contrast, section 42-4-1702, C.R.S. 2019, was enacted as part of the Uniform Motor Vehicle Law, *see* § 42-1-101, C.R.S. 2019, and by its plain terms allows only collateral challenges to alcohol- and drug-related driving offenses.  Thus, section 42-4-1702, a more specific statute, controls.  § 2-4-205, C.R.S. 2019.

¶ 26 Factors in addressing the issue of justifiable excuse or excusable neglect include: (1) whether there are circumstances or outside influences preventing a challenge to a prior conviction and the extent to which the defendant having reason to question the constitutionality of a conviction investigates its validity and takes advantage of relevant avenues of relief that are available; (2) whether a defendant had any previous need to challenge a conviction and either knew that it was constitutionally infirm or had reason to question its validity; (3) whether a defendant had other means of preventing the government's use of the conviction, so that a postconviction challenge was previously unnecessary; and (4) whether the passage of time affects the State's ability to defend against the challenge. *People v. Wiedemer*, 852 P.2d 424, 441-42 (Colo. 1993).

¶ 27 Before the sentencing hearing, defense counsel moved to suppress Jiron's conviction in Arapahoe County case number 98M101348, arguing that it had been unconstitutionally obtained.[6]

---

[6] Specifically, Jiron argued that her 1998 conviction was constitutionally infirm as the result of the application of section 16-7-301(4)(a), C.R.S. 1998, which, at the time, encouraged indigent

She argued that the time bar should not apply because, before the felony DUI statute was passed, a defendant had no need to collaterally challenge a misdemeanor DUI conviction.

¶ 28 Jiron advances the same argument on appeal, contending that her failure to seek relief within the applicable time period was the result of circumstances amounting to justifiable excuse or excusable neglect because "[p]rior to August 2015," when the felony DUI law took effect, "there was little reason to challenge unconstitutionally obtained DUI convictions."  The record, however, belies this assertion.  Jiron's 1998 conviction affected her sentence for her second and third DUIs, including by mandating jail time for her 2011 conviction.  *See* § 42-4-1301(7), C.R.S. 2005 (sentencing provision in effect for 2005 conviction); § 42-4-1307(6), C.R.S. 2010 (sentencing provision in effect for 2011 conviction).  As the trial court noted, at the time of that conviction

---

defendants charged with a misdemeanor, petty offense, or traffic offense to engage in uncounseled plea negotiations with the prosecutor before qualifying for the appointment of counsel.  Facing questions about the constitutionality of this arrangement in the wake of *Rothgery v. Gillespie County*, 554 U.S. 191 (2008), the General Assembly amended section 16-7-301(4)(a) in 2013.  Ch. 306, sec. 1, § 16-7-301, 2013 Colo. Sess. Laws 1622-23.

the United States Supreme Court had already said that you are entitled to a lawyer for a misdemeanor charge that could involve jail time. Her 201[1] conviction involved jail time . . . and more jail time because of the 1998 conviction. So after the Supreme Court spoke, she had a need to do it, she had a reason to do it, and she didn't.

¶ 29 Jiron does not explain what steps, if any, she took between 1998 and 2017 to investigate the validity of the conviction or why she did not take advantage of the avenue of relief that is statutorily provided in section 42-4-1702 to challenge the conviction. Nor does Jiron explain why, when she was charged in this case, she did not promptly challenge the validity of the 1998 conviction. Even if Jiron had no need to challenge that conviction before she was charged, she certainly did once it became clear that the conviction was integral to the prosecution's case. As the trial court recognized, even "giving [Jiron] every benefit of the doubt," the collateral attack "should have been brought within six months of November of 2015 [when Jiron was charged in this case], and was not." In fact, Jiron did not file her collateral attack until just before sentencing — more than fourteen months after she was charged with felony DUI.

¶ 30 We also reject Jiron's argument that under *Custis v. United States*, 511 U.S. 485, 487 (1994), she should have been allowed to challenge her 1998 conviction irrespective of the statutory time bar because a statute may not infringe the right to challenge a prior conviction where the conviction was obtained in violation of the right to counsel. In *Custis*, the United States Supreme Court held that a defendant who is subject to mandatory enhanced sentencing under the Armed Career Criminal Act has no constitutional right to collaterally attack her underlying state convictions in the federal courts "with the sole exception of convictions obtained in violation of the right to counsel." *Id.* But, irrespective of a defendant's grounds for asserting that her previous conviction was unconstitutionally obtained, *Custis* did not abrogate a state's ability to set time limits on collateral attacks. *See Wiedemer*, 852 P.2d at 434 ("It is well settled that states may attach reasonable time limits to the assertion of federal constitutional rights."); *see also People v. Vigil*, 955 P.2d 589, 591 (Colo. App. 1997) (holding that a lack of counsel does not amount to justifiable excuse or excusable neglect under section 16-5-402). And collateral attacks on alcohol- or drug-related traffic offenses are subject to section 42-4-1702(1),

16

which, as relevant here, precludes a collateral attack on the validity of a judgment unless the attack is commenced within six months after the date of entry of the judgment.

¶ 31 Thus, Jiron's explanation for the substantial delay in collaterally attacking her previous DUI conviction does not establish justifiable excuse or excusable neglect.

### 2. The State's Proof of Prior Convictions

¶ 32 Jiron next contends that "the State failed in its burden of proving that [she] had three prior DUI convictions."

¶ 33 We review the sufficiency of the evidence de novo. *See People v. Strock*, 252 P.3d 1148, 1155 (Colo. App. 2010). We look at the evidence as a whole and in the light most favorable to the prosecution to determine if it "is substantial and sufficient to support a conclusion by a reasonable person that the defendant" is the person previously convicted. *People v. Carrasco*, 85 P.3d 580, 582 (Colo. App. 2003). The prosecution is given the benefit of every inference that may reasonably be drawn from the evidence. *Id.* at 583. To establish by a preponderance of the evidence that Jiron had three prior convictions, the prosecution was required to show that it was "more likely than not" that Jiron is the same person who

17

was convicted in the three prior incidents. *People v. Groves*, 854 P.2d 1310, 1313 (Colo. App. 1992).

¶ 34 At the sentencing hearing, the prosecution presented the following evidence of Jiron's prior convictions:

- a certified Division of Motor Vehicles (DMV) record;

- a certified sentencing order, register of actions, and plea agreement for Arapahoe County case number 98M101348;

- a certified register of actions and plea agreement for Denver County case number 00M00320; and

- a certified sentencing order, waiver of advisal of rights, and register of actions for Adams County case number 10CR1867.

¶ 35 Defense counsel focused his argument on the 1998 conviction, arguing that the evidence was insufficient to show that Jiron was the same person who was convicted because the defendant's name on the supporting documentation was "Dorothy Marie Velasquez" and the prosecution presented a plea to a probation violation, rather than a plea to DUI.

¶ 36 The trial court took judicial notice of Jiron's signature in the court file, compared it to the signatures on the supporting evidence, and found the signatures to be consistent. *See* CRE 901(b)(3). It also compared the photograph in the DMV record to Jiron as she appeared in the courtroom and determined that the photograph was of Jiron. The trial court acknowledged that the 1998 case involved a probation violation plea agreement, but also noted that the underlying case involved a conviction for DUI. Accordingly, the trial court found that Jiron had three prior convictions for DUI.

¶ 37 Jiron contends that the evidence presented is insufficient to provide the "connecting link" between the prior convictions and Jiron because

> [t]here were no fingerprints submitted for the prior convictions. Nor were there photographs. There was no sentencing order to support the 2000 conviction, and the sentencing orders for the 1998 case and the 2010 case were not from the initial sentencing hearings. Indeed, the 1998 conviction had a different name.

¶ 38 The DMV record included Jiron's photograph, full legal name, date of birth, address, and signature. It also included a listing of all activity related to her driving history, which included her three prior DUIs:

(1)     Entry 043 showed a citation for DUI by the Englewood Police Department with a violation date of June 13, 1998, a conviction date of November 4, 1998, and a citation number of 221880.

(2)     Entry 036 had a citation for DUI by the Denver Police Department with a violation date of January 9, 2000, a conviction date of August 15, 2005, and a citation number of 00M00320.

(3)     Entry 027 showed a citation for DUI by the Adams County Sheriff's Department with a violation date of July 3, 2010, a conviction date of January 11, 2011, and a citation number of 10-9096.

¶ 39  With respect to Arapahoe County case number 98M101348, the People introduced the sentencing order, register of actions, and plea agreement, which were in the name of "Dorothy Marie Velasquez" — Jiron's former name — but listed the same date of birth as the DMV record.  The sentencing order and plea agreement were for a violation of probation in 2004, but they referred to the underlying guilty plea to DUI that originally placed Jiron on probation.  The register of actions listed personal identifying

information that matched the DMV record; it also listed an offense date as well as a ticket number for Jiron's DUI charge, and reflected a guilty plea to that charge with a sentence to probation.

¶ 40 As for Denver County case number 00M00320, the People introduced the register of actions and plea agreement, which were in Jiron's legal name with the same date of birth as the DMV record and documents from Arapahoe County case number 98M101348. The first page of the register of actions under the "Party Information" section listed not only Jiron's legal name, but that she was also known as "Dorothy Marie Velasquez." The register of actions also listed the charging date and the dates on which Jiron pleaded guilty and was sentenced. The plea agreement included Jiron's signature, an elemental advisement with the entry for "DUI with a prior DUI" circled, and a copy of the original summons and complaint listing number 00M00320 as well as her driver's license number — which matched the DMV record — and other personal identifying information.

¶ 41 Finally, with respect to Adams County case number 10CR1867, the People introduced a sentencing order, waiver of advisal of rights, and register of actions, which included Jiron's

legal name and the date of birth in her DMV record. Page one of the register of actions listed Jiron's various aliases — including the name "Dorothy Marie Velasquez" — as well as other personal identifying information matching the DMV record. The register of actions reflected the date that Jiron was charged, the ticket number, her guilty plea, and the sentencing date.

¶ 42 Reviewing the evidence as a whole and in the light most favorable to the prosecution, we conclude that it supports the trial court's finding, by a preponderance of the evidence, that Jiron had committed at least three prior DUI offenses.

## C. Motion to Suppress

¶ 43 Jiron argues that the trial court erroneously denied her motion to suppress. Although it is a close call, we conclude that there was no error.

¶ 44 Before trial, Jiron moved to suppress evidence collected from the traffic stop that led to her arrest, arguing that it was an investigatory detention that took place without reasonable articulable suspicion. In a detailed written order issued after a two-day hearing, the trial court concluded that Officer Davis had

reasonable suspicion to conduct the investigatory stop. It therefore denied Jiron's motion.

¶ 45 Review of a suppression order presents a mixed question of fact and law. *People v. Brown*, 2019 CO 63, ¶ 8. We accept the trial court's findings of fact that are supported by competent evidence, but we review the application of the law to those facts de novo. *Id.*

¶ 46 A police officer may conduct a brief investigatory stop if he has "a specific and articulable basis in fact for suspecting that criminal activity has occurred, is taking place, or is about to take place." *Id.* at ¶ 10 (quoting *People v. Perez*, 690 P.2d 853, 855 (Colo. 1984)). In determining whether an officer had reasonable suspicion, courts look to the totality of circumstances, keeping in mind that "[a]n officer is entitled to draw reasonable inferences from all the circumstantial evidence 'even though such evidence might also support other inferences.'" *Id.* at ¶ 11 (quoting *People v. Threlkel*, 2019 CO 18, ¶ 20). Relevant factors include

> (1) the particularity of the description of the offender or the vehicle in which he fled; (2) the size of the area in which the offender might be found, as indicated by such facts as the elapsed time since the crime occurred; (3) the

number of persons about in that area; (4) the known or probable direction of the offender's flight; (5) observed activity by the particular person stopped; and (6) knowledge or suspicion that the person or vehicle stopped has been involved in some criminality of the type presently under investigation.

*Id.* (quoting *People v. Bell*, 698 P.2d 269, 272 (Colo. 1985)).

¶ 47 Following a hearing on Jiron's motion to suppress, the trial court made detailed factual findings relating to the grounds for the traffic stop. As relevant here, those findings included the following.

- While on routine patrol, Officer Davis received information over dispatch that an individual had reported that his roommate, Dorothy Jiron, had assaulted him at their shared residence.

- Officer Davis was nearby when the call was reported by dispatch, so he responded to the address, without lights and sirens, and arrived "within a couple of minutes of the dispatch."

- "Based on the information Officer Davis had from dispatch, there was no reason for him to believe that the suspect had left the residence."

24

- When he arrived, Officer Davis "observed a Red Pontiac Grand Am pull out of the driveway of that specific address. The vehicle proceeded northbound on Pennsylvania and passed Officer Davis."

- Officer Davis could not see who was driving the car, nor did he see it commit any traffic infractions.

- Nonetheless, because the vehicle was leaving the house where the alleged assault had occurred, Officer Davis suspected that the driver was involved in some way with the reported assault. He therefore pulled the vehicle over.

¶ 48 While subsequent investigation confirmed Officer Davis's suspicion that the driver of the car (Jiron) was involved in the reported alleged assault, and also revealed that Jiron might be intoxicated (thereby justifying the escalation from an investigatory stop to a custodial one), we are concerned only with whether the events described above violated the Fourth Amendment's prohibition against unreasonable searches and seizures. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000) ("The reasonableness of

official suspicion must be measured by what the officers knew before they conducted their search.").

¶ 49 Relying in large part on the analysis and holding in *United States v. Bohman*, 683 F.3d 861 (7th Cir. 2012), Jiron contends that Officer Davis's search violated the Fourth Amendment because, as she puts it, "[l]eaving the scene of an alleged crime, without more, is insufficient to establish reasonable suspicion." *Bohman*, however, is distinguishable. In that case, police were surveilling a hunting cabin that a tipster — who "wanted to 'snitch in exchange for consideration on his charges'" — claimed had been used to cook methamphetamine "three times in the past two months." *Id.* at 862 (citation omitted). When a vehicle left the property, an officer pulled it over without observing a traffic violation, questioned the occupants, and discovered incriminating evidence.

¶ 50 The Seventh Circuit held that, under these facts, the officer had nothing more than a hunch that illegal activity was occurring at the hunting cabin. But a hunch was not enough. *See Terry v. Ohio*, 392 U.S. 1, 27 (1968). All that the officer knew when he stopped the departing car was that an inmate looking for favorable treatment had claimed that the cabin was occasionally used for

criminal activity.  Surveillance conducted before the stop yielded nothing that either confirmed or undermined this claim.  And the vehicle that the officer stopped did not match the description that the tipster had provided.  In short, when the officer "stopped the car he did so because it emerged from a forty-acre tract containing a suspected meth cook site." *Bohman*, 683 F.3d at 865.  That observation fell short of justifying the stop because "[a] mere suspicion of illegal activity at a particular place is not enough to transfer that suspicion to anyone who leaves that property."  *Id.* at 864.

¶ 51  In holding that the traffic stop was not constitutionally justified, the *Bohman* court carefully distinguished *United States v. Brewer*, 561 F.3d 676 (7th Cir. 2009), a case that we find particularly relevant to the facts here.  In *Brewer*, a police officer learned from dispatch that a fight had been reported at a nearby apartment complex.  As he prepared to respond, the officer "heard a popping sound that he believed was gunfire coming from the complex." *Id.* at 677.  "Within minutes he was told by the dispatcher that indeed shots had been fired," *id.*, and "saw a vehicle emerge seconds later from the complex," *id.* at 679.  The hour was

27

late and the subject vehicle was the only car on the road, so the officer "radioed to other officers to watch" for it. *Id.* at 677. They did so and pulled it over — based solely on the officer's description — a short time later. *Id.*

¶ 52 The *Brewer* court held that "the case is on the line between reasonable suspicion and pure hunch." *Id.* at 678. But after considering the totality of the circumstances, including the fact that the defendant was driving the only vehicle on the only road exiting the complex, the court concluded that those circumstances amounted to reasonable suspicion. *Id.*

¶ 53 Officer Davis had more to go on than the police did in *Bohman.* Unlike the officers there, Officer Davis was not investigating a claim that criminal activity occasionally occurred at the address in question. Rather, he was responding to a report that someone had just been assaulted at a specific residential address and that the assailant and her boyfriend (who was also present) were drunk. He arrived "within a couple of minutes" of the call to see a car exiting the driveway of the single-family home that was the source of the call. Much like the officer in *Brewer,* who "natural[ly] surmise[d] that whoever fired the shots had left the complex," 561 F.3d at 678,

it was reasonable for Officer Davis to deduce that the person driving the car away from the house where the incident had just been reported may have been involved in it. And because Officer Davis arrived at the scene in time to see the car pull out of the driveway, the potential link between the vehicle and the reported crime was more firmly established than it was in *Brewer*. *See United States v. Jackson,* 700 F. App'x 411, 416 (6th Cir. 2017) (noting that "proximity can be a relevant factor in forming reasonable suspicion").

¶ 54 To be sure, if Officer Davis had arrived at the scene a few seconds later, he might not have seen Jiron's car pull out of the driveway and our calculus might be different. But on these facts, we conclude that there was a substantial enough connection between the report of a crime and the vehicle leaving the scene to arouse reasonable suspicion on the part of an investigating officer. Accordingly, we discern no error in the trial court's ruling.

### D. "Certifying Scientist" Testimony

¶ 55 Jiron next contends that the admission of evidence concerning her BAC through Isaac Avram, the certifying scientist in the analysis of Jiron's blood sample, violated (1) her constitutional right

to confrontation; (2) her statutory right to in-person testimony; and (3) the rule against implied hearsay. We address and reject each contention in turn.

## 1.    Preservation

¶ 56  The parties agree, as do we, that Jiron preserved her claims as they relate to confrontation and in-person testimony. The parties dispute whether Jiron preserved her implied hearsay argument. Jiron asserts that a hearsay objection was included in defense counsel's objection to the admission of the lab report under *Bullcoming v. New Mexico*, 564 U.S. 647, 652 (2011), which held that "a forensic laboratory report containing a testimonial certification — made for the purpose of proving a particular fact — through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification" is inadmissible "surrogate testimony" if a defendant demands in-person testimony and the analyst who conducted the test does not testify. But the People respond that, although defense counsel argued that the testimony did not satisfy the requirements of *Bullcoming*, defense counsel did not object on hearsay grounds. We agree with the People.

¶ 57 Before trial, defense counsel filed a request for in-person testimony. On the morning of trial, the prosecutor told the trial court that the laboratory employee she was calling was the certifying scientist, Avram, and not the analyst who actually analyzed the blood sample. Defense counsel objected, asserting Jiron's right to confrontation. The court deferred ruling.

¶ 58 Avram testified and was tendered as an expert in the field of blood analysis. Defense counsel had no objection to this qualification, but stated he "would object if there was any attempt to bring out further testimony as far as forensic toxicology or opinions on -- the results of analysis." When the prosecutor moved to admit the BAC report, defense counsel objected to "foundation and chain of custody." Later, Avram testified that he did not have any reason to doubt the reliability of the test results and defense counsel objected that Avram's statement "calls for speculation." Finally, defense counsel supplemented his objection, under the Sixth Amendment of the United States and Colorado Constitutions and *Bullcoming* and *Marshall v. People*, 2013 CO 51, "that [Avram's] testimony does not meet what the court found to be sufficient for confrontation purposes in *Marshall*. And, therefore, that evidence

31

should not be presented to the jury, absent the opportunity to confront . . . the analyst who actually performed the test[.]"

¶ 59 Because defense counsel did not raise a hearsay objection, the implied hearsay claim Jiron presents on appeal was not preserved. *See People v. Ujaama*, 2012 COA 36, ¶ 37. As a result, we will reverse only if the trial court committed plain error. *Id.*; *see* Crim. P. 52(b).

      2.    Confrontation Clause and Section 16-3-309(5)

¶ 60 We first address Jiron's contentions that allowing a certifying scientist to testify to the results of the chemical analysis violated her constitutional right to confrontation and statutory right to in-person testimony.

¶ 61 We review confrontation claims and a district court's evidentiary rulings under section 16-3-309(5), C.R.S. 2019, de novo. *Bernal v. People*, 44 P.3d 184, 198, 200 (Colo. 2002); *People v. Hill*, 228 P.3d 171, 173 (Colo. App. 2009).

¶ 62 The United States and Colorado Constitutions guarantee a criminal defendant the right to confront the witnesses against her. U.S. Const. amend. VI; Colo. Const. art. II, § 16; *People v. Fry*, 92 P.3d 970, 975 (Colo. 2004). Thus, the out-of-court testimonial

statements of a witness who does not appear at trial are barred unless (1) the witness is unavailable and (2) the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 54 (2004). Forensic laboratory reports are testimonial in nature, *Bullcoming*, 564 U.S. at 665, and are only admissible when the defendant has the opportunity to cross-examine the person who prepared the report. *Id.* at 658; *see also Cropper v. People*, 251 P.3d 434, 436 (Colo. 2011).

¶ 63 *Bullcoming* held that a "surrogate" analyst who did not observe the test or sign the certified report could not testify about the report's contents. 564 U.S. at 661. But more recently, our supreme court held that a supervisor's testimony satisfies the Confrontation Clause when the supervisor prepares or signs the report and independently reviews the testing data. *Marshall*, ¶ 19.

¶ 64 As noted, Avram was called by the prosecution and was certified as an expert in blood analysis. Avram described generally the steps involved in the testing process and explained that each test requires both an analyst and a certifying scientist in order to generate a valid result. The only difference between the analyst and the certifying scientist is that the "analyst will sample the blood

sample and load it on the instrumentation" involved in the analysis, "[a]nd then after that, the analyst and the certifying scientist will conduct all of the same steps." Avram testified that his involvement in this case was as a certifying scientist, which he confirmed required him to "independently review[] the calibration and all of the data the analyst would have reviewed" and to ensure the standard operating procedures of the laboratory were followed. Avram further testified that, as a certifying scientist, he "did not have any direct contact with the blood" and he was not a supervisor. The court admitted the report of analysis and Avram testified that Jiron's BAC was .334.

¶ 65 Here, as in *Marshall* and *People v. Fuerst*, 2019 COA 2, Avram's testimony satisfied the requirements of the Confrontation Clause and section 16-3-309(5). In *Marshall*, the supervisor oversaw the testing process, reviewed the data generated by the test, reviewed the testing instruments themselves, reviewed the analysts' testing notes to determine the accuracy of the procedures the analysts employed, and certified and signed off on the report generated. *Marshall*, ¶ 19. Our supreme court concluded that this

34

level of involvement sufficiently protected the defendant's right of confrontation. *Id.* at ¶ 20.

¶ 66 Similarly, although Avram was not a supervisor, he participated in the testing process as the certifying scientist, reviewed the data and came to an independent conclusion, ensured that the standard operating procedures of the laboratory were followed, and approved the results. Notably, other than loading the blood sample into the instrument, the analyst and the certifying scientist conducted "all of the same steps." This was not merely "surrogate testimony," but was testimony from one integrally involved in the testing process "who accomplished the requested analysis." § 16-3-309(5); *see Marshall*, ¶¶ 22-23.

¶ 67 We are not persuaded otherwise by Jiron's argument that Avram was not a supervisor. The lack of formal supervisory authority is "immaterial" where, as here, the witness "led the process of reviewing the test results, employed the [lab's] quality control process," and approved the results. *Fuerst*, ¶ 33.

### 3.    Implied Hearsay

¶ 68 We next address Jiron's contention that the certifying scientist's testimony was inadmissible implied hearsay.

¶ 69   We review evidentiary issues for an abuse of discretion. *People v. Stewart*, 55 P.3d 107, 122 (Colo. 2002).  Because this portion of Jiron's argument is unpreserved, we review these statements for plain error and will reverse only if they "so undermined the fundamental fairness of the trial itself so as to cast serious doubt on the reliability of the judgment of conviction." *Hagos v. People*, 2012 CO 63, ¶ 14 (quoting *People v. Miller*, 113 P.3d 743, 750 (Colo. 2005)).

¶ 70   Hearsay is "a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  CRE 801(c).  The rule against hearsay encompasses not only verbatim out-of-court statements, but also implied hearsay or testimony that raises an inference of out-of-court statements.  *See Golob v. People*, 180 P.3d 1006, 1010-11 (Colo. 2008); *People v. Griffin*, 985 P.2d 15, 17 (Colo. App. 1998).  Unless an exception applies, hearsay statements are generally inadmissible.  CRE 802.

¶ 71   Under CRE 703, Avram's testimony is properly classified as nonhearsay because he performed his own independent review and reached an independent conclusion in the case.  *See* CRE 703

(permitting an expert to testify to facts and data that are otherwise inadmissible in evidence so long as they formed the basis of the expert's opinion and are of the type reasonably relied upon by experts in the field).  Accordingly, we perceive no reversible error in admitting Avram's statements.

### E.     Admissibility of Officer Testimony

¶ 72  Finally, Jiron contends the trial court erred by allowing testimony from Officer Davis regarding roadside sobriety examinations and blood draws when he was not qualified as an expert witness.

¶ 73  Officer Davis testified that he had conducted approximately thirty to forty DUI investigations during his six years on the police force.  He explained that he was trained in three roadside maneuvers — the horizontal gaze nystagmus (HGN) test, the walk and turn, and the one-leg stand — and then discussed what each of those maneuvers involved, what he was looking for, and how Jiron performed.  Regarding the HGN test, Officer Davis testified that "[n]ystagmus, by definition, is the involuntary jerking of the eyes.  If you move your eyes side to side, as a sober person your eyes will move very smoothly."  Defense counsel objected that "this is getting

37

into expert testimony," and the court overruled the objection. Next, Officer Davis testified that on each of the maneuvers, he noticed clues of intoxication, leading him to conclude that, "[t]hrough my training and experience, this Defendant was very intoxicated."

¶ 74 Officer Davis then testified that about thirty percent of his DUI investigations had involved blood draws, and that he was present for Jiron's blood draw. The prosecutor asked Officer Davis if there was "anything concerning or out of the ordinary with the blood draw that you observed" in this case. After the trial court overruled defense counsel's objection, Officer Davis answered that he had not seen anything unusual.

¶ 75 We review evidentiary rulings for an abuse of discretion. *Campbell v. People*, 2019 CO 66, ¶ 21. A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 76 If we determine that a trial court has abused its discretion regarding a preserved, nonconstitutional issue, then we must consider whether the error was harmless. *Id.* at ¶ 22. Under this standard, reversal is required only if the error affected the parties' substantial rights. *Id.*

¶ 77 Here, whether the trial court abused its discretion by admitting Officer Davis's testimony turns on whether the testimony was improper under CRE 701. *Stewart*, 55 P.3d at 122. We rely on CRE 701, which governs the admission of opinion testimony by a lay witness, rather than CRE 702 governing expert testimony, because the prosecution did not seek to qualify Officer Davis as an expert witness. *Id.* CRE 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

¶ 78 The application of CRE 701 to police officer testimony "has generated equal measures of confusion and controversy." *Stewart*, 55 P.3d at 123. Law enforcement officers are often qualified as experts to offer certain types of specialized testimony, such as accident reconstruction, but also regularly offer lay opinion testimony under CRE 701 "based on their perceptions and experiences." *Id.* "Officer testimony becomes objectionable when

what is essentially expert testimony is improperly admitted under the guise of lay opinions." *Id.*

¶ 79 In *Campbell*, ¶ 31, our supreme court recently concluded that a law enforcement officer's testimony describing the results of HGN testing was impermissible expert testimony by a lay witness. Focusing in large part on the officer's extensive discussion of his training and experience in administering and interpreting HGN tests, the court also pointed out that the prosecutor elicited answers from the officer on direct examination that were "not the type of testimony that someone with only a lay understanding could have been expected to offer." *Id.* at ¶¶ 27-29. Nevertheless, the court found that the error was harmless, given the overwhelming evidence proving that the defendant was intoxicated. *Id.* at ¶¶ 35-41.

¶ 80 Jiron contends that Officer Davis improperly testified as an expert when he (1) testified that Jiron was "very intoxicated"; (2) testified that there was nothing unusual about the blood draw in this case; and (3) defined the term "nystagmus."

¶ 81 It is well established that lay witnesses may opine as to whether a defendant was intoxicated. *People v. Souva*, 141 P.3d

40

845, 850 (Colo. App. 2005). Officer Davis's testimony that Jiron was "very intoxicated" was a proper lay opinion based on his perceptions and observations, not any specialized skill or experience. *See id.*

¶ 82 We acknowledge that, under *Campbell*, the officer's description of the HGN test exceeded the permissible scope of lay testimony. However, even if we were to assume that his testimony about the blood draw procedure was also improper, any error in admitting this evidence was harmless.

¶ 83 Officer Davis testified that Jiron smelled strongly of alcohol, her speech was slurred, her eyes were glassy and watery, she was uneasy on her feet, and she admitted to drinking a few beers before driving. The People admitted evidence showing that Jiron's BAC was .334. The jury instructions provided that if Jiron's blood alcohol content exceeded 0.08, the jury could infer that she was under the influence of alcohol. Jiron "never denied that she had something to drink that night"; rather, she "admitted to drinking" and her defense at trial was that she was sitting in her car "to catch a moment alone, but she wasn't driving."

¶ 84　Given the overwhelming evidence of Jiron's intoxication, as well as the nature of her defense, we conclude that admission of Officer Davis's testimony regarding the blood draw procedure and the HGN test, when measured against all of the evidence, did not substantially influence the verdict or affect the fairness of the trial proceedings. *See Campbell*, ¶¶ 35-41. Accordingly, we find no grounds for reversal.

### III.　Conclusion

¶ 85　The judgment is affirmed.

JUDGE RICHMAN and JUDGE FREYRE concur.